In re MINISCRIBE CORPORATION,
a Delaware corporation, Debtors.

Tom H. Connolly, Chapter
7 Trustee, Claimant,

v.

Harris Trust Company of California,
Indenture Trustee, and the United
States Trustee, Respondents.

Bankruptcy No. 90 B 00001 E.

United States Bankruptcy Court,
D. Colorado.

Nov. 24, 1999.

Gregory L. Williams, Donald J. Quigley, Block Markus Williams, L.L.C., Denver, Colorado, for Tom H. Connolly, Trustee.

A. Bruce Campbell, David P. Hutchinson, Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Denver, Colorado, for Harris Trust Company of California, as Indenture Trustee.

Jane E. Frey, Denver, Colorado, for the United States Trustee.

## OPINION AND ORDER ON CHAPTER 7 TRUSTEE'S FINAL APPLICATION FOR COMPENSATION

CHARLES E. MATHESON, Chief Judge.

### I. INTRODUCTION

During the 1980's, MiniScribe Corporation ("MiniScribe" or the "Debtor") was a successful manufacturer of computer disc drive systems. Eventually, competition began to impact the company's sales and the threat of declining profits had the prospect of adversely impacting the company's stock prices. Seeking to avoid this calamity, certain of the members of the company's management elected to engage in the inventive practice of shipping boxes of bricks and booking the shipments as sales. While this practice had some short term advantages, it inevitably failed bringing certain financial ruin. The financial distress brought on shareholder litigation seeking damages for the fraud.

MiniScribe filed a petition under chapter 11 on January 1, 1990. At that time, Standard Chartered Bank ("SCB") was its principal secured creditor. The company also had significant equipment lease agreements with ELLCO Leasing ("ELLCO"). It had $97.5 million of outstanding debt represented by subordinated debentures issued under an indenture with Harris Trust ("Harris"). It also had other significant unsecured debt outstanding, principally with trade suppliers (all collectively hereafter referred to as "Trade" debt). Rehabilitation in chapter 11 was unavailing, and the company engaged in a sale of its business to Maxtor, one of its competitors. The sale did not realize sufficient proceeds to pay all of the secured debt, much less the costs of administration of the chapter 11 or any of the unsecured debt. There being no further purpose to be served by the chapter 11, the case was converted to chapter 7 and Tom H. Connolly, Esq., was appointed as the trustee ("Trustee") on April 26, 1991.

During his administration, the Trustee disbursed $101,492,332 through his accounts. Of this, $84.1 million represented proceeds from the settlement of an action seeking recovery related to the fraud perpetrated at MiniScribe. The balance came principally from preference and fraudulent transfer cases. Harris and the U.S. Trustee dispute whether such funds were all property of the estate or should be counted for purposes of the cap established by 11 U.S.C. § 326. This Court has already decided the section 326 issue in its Order Granting Trustee's Motion for Partial Summary Judgment. Regardless, the payments made were sufficient to pay SCB

and ELLCO the agreed amounts of their compromised claims, to pay the Trade claims in full, to pay all of the costs of administration of the chapter 11 and the chapter 7 and, if the Trustee's fee is paid in full, to return a total of $9.735 million to the debenture holders. For his services, Mr. Connolly seeks a fee of $3,044,953, which is the maximum that could be allowed under section 326. Both Harris and the U.S. Trustee (collectively referred to as the "Objectors") object.

## II. THE LEGAL STANDARDS FOR FEE ALLOWANCE.

The Trustee in this case seeks compensation under sections 326 and 330 of the Code. The version of section 330 [1] which applies to this case provides:

After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, ..., the court may award to a trustee, ...

(1) reasonable compensation for actual, necessary services rendered by such trustee, ... and by any paraprofessional persons employed by such trustee, ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

The applicable section 326 [2] provides:

(a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed fifteen percent on the first $1,000 or less, six percent on any amount in excess of $1,000 but not in excess of $3,000, and three percent on any amount in excess of $3,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

■ The Trustee urges an interpretation of the those two sections which would begin and end with the percentages set forth in section 326. The Trustee argued during closing argument that he is "entitled" to the cap under the extraordinary facts of this case. There is case law which supports the Trustee's interpretation. *In re Guyana Development Corp.*, 201 B.R. 462, 483 (Bankr.S.D.Tex.1996).

In *Guyana*, the chapter 11 trustee sought the maximum compensation under section 326 under circumstances in which a strict lodestar, even with an enhanced hourly rate, would yield a substantially lower fee than the statutory maximum. In its findings, the court describes a complex case involving multiple litigation in five different countries; seizing or freezing estate property both domestically and in several foreign countries; preserving value and minimizing contingent liabilities in the estate's rapidly expiring oil and gas interests; coordination of settlement negotiations among the various major parties-in-interest and coordination of the litigation over allowance or priority of more that $900 million of claims asserted against the estate. The trustee had only $300,000 in cash when he was appointed and raised over $60,000,000 in gross proceeds from the sales of estate assets resulting in a payout to the general unsecured creditors, including the objecting creditor, of over 88% of their claims.

The *Guyana* court conducted an extensive analysis of the legislative history behind section 326 and concluded that it was designed as an incentive to a trustee to

---

1. This case was filed in 1990. Thus the version of section 330 which was in effect at that time is the applicable provision. The amendments made by the Bankruptcy Reform Act of 1994 do not apply.

2. The amendments made by the Bankruptcy Reform Act of 1994 increased the percentages used to calculate the statutory cap. The percentages previously in place apply to this case.

collect assets. The court observed that the Fifth Circuit, following its pronouncement in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), affirmed an award of the maximum statutory percentage allowed under the Bankruptcy Act without considering the *Johnson* factors.[3] *Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088 (5th Cir.1980). In the same decision, however, the circuit looked to the bankruptcy court's application of the *Johnson* factors to the trustee's attorney's fees. The *Guyana* court concludes that the circuit recognized a distinction in compensation available to trustees under section 326 and that available to attorneys. *Guyana* at 478. "Indeed, in the context of maximum local caps on attorney compensation, the Fifth Circuit held in *In re U.S. Golf Corp.*, 639 F.2d 1197, 1206 (5th Cir.1981). 'It is simply not possible to seriously weigh the *Johnson* factors in the face of an absolute maximum fee'." *Id.* at 478–479. From there, the court drew an analogy between bankruptcy cases and common fund cases in which it describes an increased use of percentage based compensation "as a backlash" to *Johnson*.[4] Ultimately, the *Guyana* court concludes, based on its knowledge of the

case and upon the time records submitted by the trustee, that seven of the *Johnson* factors supported the reasonableness of the trustee's proposed maximum statutory percentage compensation.[5]

The *Guyana* court's analysis is thorough, grounded, in part, in Fifth Circuit authority and appealing on some levels, but this Court believes it goes too far in its pronouncement regarding section 326. While it does not explicitly reject what is stated in the legislative history, and in fact acknowledges generally that section 326 is not an entitlement provision, *Guyana* at 474, it nevertheless starts with the section 326 cap and conducts a reasonableness analysis from there using the *Johnson* factors. This Court rejects such an interpretation as contrary to the statute and the legislative history behind section 326.

This Court earlier addressed the interplay between these two provisions in the context of the Trustee's Motion for Partial Summary Judgment on the question of whether the $65.5 million amount paid to SCB and ELLCO out of the settlement proceeds from the fraud case should be included for the purpose of calculating the

---

**3.** The *Johnson* factors, as they have come to be referred to, are listed below in this Opinion at pages 734–735.

**4.** "Subsequent to *Johnson,* the appropriateness of the court's consideration of any factors other than hourly rate multiplied by hours worked (the lodestar) in evaluating reasonable attorney's fees has become more and more restricted which has conversely led to a backlash to increasing use of percentage based compensation for attorneys in common fund cases, to which a bankruptcy case is analogous." *In re Guyana Development Corp.*, 201 B.R. at 479.

**5.** The court looked at the novelty and difficulty of the questions presented in the case; the skill required to perform the services properly; preclusion of other employment due to the acceptance of the case; the customary fee and awards in similar cases; whether the fee is fixed or contingent; the amount of time and the results obtained; the experience, reputation and ability of the professionals and paraprofessionals who performed the services in

the case; and the undesirability of the case. It is interesting to observe that in the context of discussing the customary fee and awards in similar cases the court writes:

> The requested compensation is within the limits prescribed by 11 U.S.C. § 326. While there is no prevailing hourly rate in the community for the type of work accomplished by the trustee, there is a prevailing percentage compensation rate in this community for exceptional trustee accomplishments, and that rate is the maximum compensation permitted under 11 U.S.C. § 326(a). This Court has reviewed recent cases in the Southern District of Texas which reflect compensation awarded in large liquidation and reorganization cases. Despite the lack of uniformity in trustee record keeping and in time expended in performance of trustee duties, compensation has been awarded in a handful of extremely large cases close to or at the maximum compensation allowed by the Bankruptcy Code. *In re Guyana Development Corp.*, 201 B.R. at 483.

statutory cap of section 326. In answering the question in the affirmative, the Order Granting Trustee's Motion for Partial Summary Judgment ("Order") relied on and recited the critical portions of the legislative history of section 326. The applicable portion upon which this Court again relies bears repeating here:

> This section is derived in part from section 48c of the Bankruptcy Act. It must be emphasized that this section does not authorize compensation of trustees. This section simply fixes the maximum compensation of a trustee. Proposed 11 USC § 330 authorizes and fixes the standard of compensation. Under section 48c of current law, the maximum limits have tended to become minimums in many cases. This section is not intended to be so interpreted. *The limits in this section, together with the limitations found in section 330, are to be applied as outer limits, and not as grants or entitlements to the maximum fees specified* .... H.R.Rep. No. 595, 95th Cong., 1st Sess. 327 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 37–38 (1978). (Emphasis added).

The legislative history is explicit in its rejection of an "entitlement" theory. A court must instead start with section 330, reach a determination of what is a reasonable fee under that section and then look to the cap as calculated in section 326 to allow a trustee's fee. Accord *In re Lan Associates XI, L.P.*, 237 B.R. 49 (D.N.J. 1998), *aff'd*, *In re Lan Associates XI, L.P.*, 192 F.3d 109 (3rd Cir.1999). It is that determination that this Court will undertake based on the facts of this case.

This Court has recognized that the setting of fees, whether by the court or counsel, is an art, not a science. *In re Frontier Airlines, Inc.*, 74 B.R. 973 (Bankr.D.Colo.1987). The law which has evolved largely reflects an effort to make the art more scientific, at least to survive appellate review. See *Brown v. Phillips Petroleum Company*, 838 F.2d 451, 453–454 (10th Cir.1988) ("This formulation, generally known as the lodestar method, provides the starting point for appellate court review of statutory fee awards to determine whether a trial court has abused its discretion."); *Ramos v. Lamm*, 713 F.2d 546, 552 (10th Cir.1983). ("In recent decisions we have referred to the *Johnson* factors for computing attorney's fee awards ... In part we have done this to ensure that the district courts articulate specific reasons for fee awards to give us an adequate basis for review."); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir.1974) ("The reasonableness of the award is to be judged by the abuse of discretion standard of review. Citations omitted. But in utilizing this standard we must carefully review the basis upon which the District Court made its award. It is at this juncture that we have difficulty with the District Court order. The judgment does not elucidate the factors which contributed to the decision and upon which it was based."). Notwithstanding the effort and intention to make fee determinations objective, the reality is that measuring the value of the professional's contribution remains highly subjective.

Section 330 of the Code provides the factors a court must consider in awarding fees. The threshold consideration must be whether the services provided were necessary and provided a benefit to the estate. *In re Lederman Enterprises, Inc.*, 997 F.2d 1321 (10th Cir.1993). The reasonableness of the fee is measured based on: the nature, the extent and the value of such services, the time spent and the cost of comparable services other than in a bankruptcy case.

The lodestar method of calculating fees, multiplying a reasonable number of hours times a reasonable hourly rate, has become the benchmark for arriving at a reasonable fee. The United States Supreme Court revisited the fee arena in the case of *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). There the Court affirmed the principle that in awarding fees a court should start with the

lodestar established by applying a reasonable hourly rate to the reasonable number of hours required for the task. The Court in the *Blanchard* case relied on its previous opinion in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) which, in turn, relied on *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). The Court explained:

> *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), directed lower courts to make an initial estimate of reasonable attorney's fees by applying prevailing billing rates to the hours reasonably expended on successful claims. And we have said repeatedly that "the initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984). The courts may then adjust this lodestar calculation by other factors. We have never suggested that a different approach is to be followed in cases where the prevailing party and his (or her) attorney have executed a contingent-fee agreement. To the contrary, in *Hensley* and in subsequent cases, we have adopted the lodestar approach as the centerpiece of attorney's fee awards. The *Johnson* factors may be relevant in adjusting the lodestar amount, but no one factor is a substitute for multiplying reasonable billing rates by a reasonable estimation of the number of hours expended on the litigation.

*Blanchard v. Bergeron*, 489 U.S. at 94, 109 S.Ct. at 945.

■ Traditionally, in bankruptcy cases, the process of measuring the reasonableness of attorneys' fees has involved an analysis of the standards set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). The Tenth Circuit Court of Appeals has adopted the *Johnson* factors and applied them "in a bankruptcy proceeding that involves construing contracts and notes which expressly call for the award of reasonable attorneys' fees. Indeed the cases have held that these standards are fully applicable to the award of attorneys' fees in connection with bankruptcy proceedings. Representative cases from the Fifth Circuit are: *In the Matter of U.S. Golf Corp.*, 639 F.2d 1197 (5th Cir.1981); *In the Matter of Multiponics, Inc.*, 622 F.2d 731 (5th Cir.1980); and *In the Matter of First Colonial Corp.*, 544 F.2d 1291 (5th Cir.1977)." *In re Permian Anchor Services, Inc.*, 649 F.2d 763, 768 (10th Cir.1981) (these cases apply the *Johnson* factors in the allowance of attorney's or trustee's fees under a predecessor to section 330). The *Johnson* factors are as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service property; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and, (12) awards in similar cases.

Section 330 of the Code includes its own set of considerations, only some of which are subsumed within the *Johnson* factors. An element which must be considered under section 330 which is not included within the *Johnson* factors is "the cost of comparable services *other than in a case under this title.*" *Johnson* requires an analysis of the customary fee—the customary fee for *similar work in the community*. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 718 (5th Cir.1974).

The comparison of bankruptcy cases to common fund cases deserves consideration, especially under the facts of this case. The typical common fund case involves a class action law suit in which the prevailing plaintiffs recover a "common fund" and the plaintiffs' attorneys are awarded a fee

based on a percentage of the common fund. The Tenth Circuit has endorsed the use of a percentage of the common fund in awarding attorneys' fees but have circumscribed this by subjecting that percentage award to a reasonableness analysis, specifically the *Johnson* factors. *Brown v. Phillips Petroleum Company, et al.*, 838 F.2d at 454. More recently, the circuit court, in a case which involved the attorneys' fees for the MiniScribe shareholder class action suit, reiterated its endorsement of this "hybrid" approach. *Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir.1994). In so doing, it distinguished common fund cases from statutory fee cases, particularly civil rights cases, out of which the body of law on the use of the lodestar has developed. Its discussion is instructive:

> Many courts have addressed the propriety of utilizing the percentage of the fund instead of the lodestar in calculating attorneys' fees in common fund cases. There are advantages and disadvantages with each method, although the more recent trend has been toward utilizing the percentage method in common fund cases. *Id.* (Citations omitted).

The court notes in a footnote to the foregoing that "Indeed, attorneys generally are departing more from calculating fees on an hourly basis, reflecting the fact that the number of hours spent on a particular piece of legal business is not always the best measure of the value of that work." *Id.*

The *Gottlieb* court harkens back to its decision in *Brown v. Phillips Petroleum Company*, 838 F.2d 451 (10th Cir.1988) where the circuit signaled acceptance[6] of the use of percentage of the fund basis in common fund cases. *Gottlieb v. Barry*, 43 F.3d at 482. In *Brown* the court contrasts the underlying purpose in common fund cases with statutory fee cases as follows:

> The common fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense." Common fund fees derive in part from the common law premise that a trustee is entitled to reimbursement from the fund administered. Fees in common fund cases are extracted from the predetermined damage recovery rather than obtained from the losing party. Thus, common fund fees are neither intrinsically punitive nor designed to further any statutory public policy. Conversely, statutory fees are intended to further a legislative purpose by punishing the nonprevailing party and encouraging private parties to enforce substantive statutory rights. Thus, unlike statutory fees, which result in a shifting of the fee burden to the losing party, common fund fees result in a sharing of the fees among those benefitted by the litigation. As the footnote in *Blum* recognizes, another important difference is that normally a large number of people or entities benefit from a common fund case while the number benefitted is not "a consideration of significance in calculating the award of statutory attorneys' fees." *Brown v. Phillips Petroleum Company*, 838 F.2d at 454 citing *Blum v. Stenson*, 465 U.S. at 900 n. 16, 104 S.Ct. at 1550 n. 16. (Citations omitted.)

Bankruptcy cases to some degree parallel common fund cases. The creditors all share in distributions from the assets of the estate, and the trustee leads the effort to maximize the assets available for the benefit of all, no just one. Correspondingly, those that benefit share the cost of that effort. The Bankruptcy Code establishes a payment scheme which places payment of the trustee's fee prior to those who are benefitted by them and, arguably in a chapter 7 or 11, sets a cap on the trustee's compensation. Having said that, and notwithstanding the section 326 cap however,

---

6. The circuit court in *Brown* relied on dicta in *Blum v. Stenson*, a statutory fee case, to hold that "the award of attorneys' fees on a per- centage basis in a common fund case is not per se an abuse of discretion." *Brown v. Phillips Petroleum Company*, 838 F.2d at 454.

it is possible for the trustee's fee and his professionals to consume the entire "fund" recovered by the trustee's efforts. In the usual case, the assets of the estate are "fixed" and creditors may be in the same position as to any return on their debts as they would have been without the trustee's marshaling of assets. In this case, however, the significant assets available to satisfy the claims of the creditors were the Trustee's fraud action and the various recovery actions extant only by the provisions of the Bankruptcy Code. The Trustee, like the attorney for the shareholder class in the *Gottlieb* case, recovered a substantial fund through that fraud litigation for the benefit of all creditors. That is a striking parallel which may serve to justify the use of a percentage of the fund calculation in determining the Trustee's fee.

## III. THE EVIDENCE.

The Court heard the testimony of a number of witnesses who testified concerning the administration of the bankruptcy case and the conduct of the litigation. In addition, each side presented the opinions of "expert" witnesses. There is not any real dispute concerning the essential facts, but there are hotly contested interpretations to be placed on the facts. The Court finds the pertinent facts to be as follows:

### A. General Facts.

When the fraud at MiniScribe was discovered, the board of directors of the company appointed an independent committee to investigate and to determine whether the company had the ability to recoup any of its losses. That committee, in turn, engaged the services of professionals to investigate and report. The resultant report was exhaustive in its treatment and identified potential responsible parties. However, the report tended to exonerate the company's accounting firm, Coopers & Lybrand.

Needless to say, considering the fraud and the fact that MiniScribe was a public company, the company's board of directors were not the only ones considering litigation. Even before bankruptcy was filed, a class action was commenced in the District of Colorado on behalf of a class of persons who had purchased stock during the time the false shipments were being made. Another similar action was filed in Texas. Subsequently, SCB and ELLCO each filed separate actions in the District of Colorado, and there was another action instituted on behalf of four of the subordinated debenture holders.

While the chapter 11 was pending, the Debtor sought leave to hire special litigation counsel, and the Court authorized the employment of the firm of Dufford & Brown ("D & B") to represent the Debtor. The Debtor then filed an action in the state court against the accountants and certain others, seeking to recover for the "losses" the company had allegedly incurred by reason of the fraudulent activities. That action was removed to the federal district court in Colorado.

In addition to the pending fraud action, the Debtor had commenced a number of actions seeking recovery under sections 547 and 548 of the Bankruptcy Code. By the time the Trustee was appointed, at least one of those actions had been settled, and some funds were flowing into the bankruptcy estate.

When the Trustee was appointed, he began the administration of an estate that had approximately $150,000 in the bank, significant administrative claims related to the pending litigation, and no assets other than potential recoveries from the litigation. The outstanding claims included administrative claims by SCB and ELLCO, Trade claims in excess of $18,000,000, unsecured claims by SCB of $66,500,000 and of ELLCO for $6,500,00, and the claims of the subordinated debentures in the principle amount of $97.5 million. The claims' register for the estate reflected total claims in the estate of some $900 million.

At the outset, liquidity was a problem. While the estate did have some dollars coming in from the recovery litigation, it had massive expenses to fund all of the litigation. SCB had a pending super-priority claim that the chapter 11 Creditors' Committee had been disputing, and that issue was unresolved. The Trustee settled the dispute with SCB, convincing SCB to not only reduce its administrative claim from $17 million to $1 million, but to also provide an administrative loan of $1,000,000 to be used to defray the cost of prosecuting the fraud action.

The Trustee prevailed on D & B to remain as counsel and to continue to prosecute the fraud litigation. The Trustee became directly and heavily involved in that prosecution. Mr. Schaeffer, one of the attorneys from D & B, testified that the Trustee eliminated "drift" in the conduct of the litigation because of his involvement and his ability to make informed decisions as the case progressed. At the Trustee's request, the focus of the damages evaluation changed from a claim of $400,000,000 premised on a loss of equity value, to a claim of $200,000,000 premised on an inability to pay debt. In the Trustee's view, his suit encompassed the claims of all of the creditors. Because it did so, it had the broadest coverage of any of the cases pending in Colorado. While there is some dispute between the parties as to whether or not the Trustee was responsible for the result, the fact is that Judge Matsch ultimately selected the Trustee's case as the lead case to go to trial. D & B had worked diligently to put the Trustee's case together for trial, and believed that they were ready to proceed with the court's trial schedule.

One of the most significant factors in favor of the Trustee was the ruling by Judge Matsch denying the defendants' motion for summary judgment. This motion had been premised on the theory that the company was, in effect, the beneficiary of the fraud and was, therefore, barred from seeking to recover any alleged loss. Being able to prevail on that issue, at least for summary judgment, gave the Trustee greatly increased leverage in the ensuing settlement negotiations.

Following the trial setting, Judge Matsch referred the matter to a magistrate judge for settlement purposes. While all of the parties were involved in the negotiations, all of the witnesses praised the efforts of the Trustee and indicated that the Trustee, together with counsel for the shareholder class, had lead the settlement discussions. The settlement negotiations were difficult and multifaceted because not only did the Trustee have to negotiate with the defendants to establish the availability and size of a cash pool, he also had to negotiate with counsel for the shareholder class concerning the allocation of the settlement pool between the shareholder and the creditor factions, and then negotiate with the creditor claimants as to the allocation of the remaining funds.

Ultimately the negotiations proved successful. The plaintiffs were able to negotiate an agreement whereby the defendants agreed to contribute $128.1 million to the settlement of all of the cases. Of that amount, $44 million was allocated to the shareholder class, leaving $84.1 million available to the claims of the creditors, including the Trustee. Out of the $84.1 million, $4.1 million was earmarked to settle the claims of those debenture holders who had filed a separate lawsuit.

The Trustee was convinced that, if the litigation proceeded, he would be able to recover enough so that a distribution to the debenture holders would be possible. He was concerned, however, that if he obtained a judgment for the entire amount of his claim, the defendants would never be able to pay it. Nevertheless, one of the fundamental requirements in the Trustee's view was that, in structuring a settlement, there must be funds available out of the remaining $80 million for the debenture holders. In order to achieve that goal, it was necessary for the Trustee to convince SCB and ELLCO to reduce the amounts

of their claims against the estate. Consideration also had to be given to the Trade creditors.

The Trustee's negotiations were made more complex because they came at a time in the administration of the bankruptcy estate when there remained significant unknowns. The Trustee believed that the Trade claims, as filed, greatly exceeded the amount that would ultimately be allowed, but it was difficult to estimate with any certainty what the final number would be. In addition, there were a host of pending and unresolved recovery actions. Thus, the Trustee did not know the ultimate size of the estate. These factors affected the possible payment of administrative claims and the potential distributions that might be made to the Trade and to the debenture holders. The attendant uncertainties complicated the structuring of any kind of global settlement.

The negotiations culminated in the Distribution Agreement (Trustee's Exh. 4). As set forth in that Agreement, SCB agreed to reduce its unsecured claim for $65.5 million to $60.5 million. ELLCO also reduced its claim, from $6.5 million to $5.5 million. Those claim reductions enabled the Trustee to allocate approximately $6.5 million to the debenture holders. The remaining funds were to be allocated between the debentures and the Trade according to their allowed claims. The resolution of the intra-creditor allocations enabled the Trustee, once the Distribution Agreement was approved by the Court, to make immediate distributions to the holders of allowed claims.

As noted above, not only did the Trustee have the fraud litigation going, he also had over 45 adversary proceedings pending, and was actively engaged in reviewing and objecting to claims that had been filed against the estate. These adversary proceedings and contested matters ultimately realized over $17 million for the estate and resulted in the reduction in the claims against the estate from approximately $900 million to a total of approximately $168 million.

All that was realized from these adversary proceedings did not come simply as a result of the litigated or settled claims. Of significance is the Trustee's handling of the settlement with Sunward. Sunward had received, prepetition, a payment from MiniScribe of some $3 million. The Debtor, during the chapter 11, commenced a recovery action against Sunward and settled that action pursuant to an agreement whereby Sunward was to pay MiniScribe a total of $800,000 in a series of payments, starting with a $300,000 payment in April 1991. Sunward. however, was encountering its own financial problems, and was only able to pay $150,000 in April. Negotiations for a revised settlement were successful, but Sunward was again unable to pay, and was facing the prospect of its own bankruptcy if the Trustee forced the issue. Ultimately, the parties compromised with the Trustee agreeing to take an equity interest in Sunward. In the fullness of time, the Trustee liquidated that equity interest for a total recovery from Sunward of $4.6 million.

The Trustee had other significant litigation to contend with, part of it evolving out of the sale of the MiniScribe assets to Maxtor and asserted claims of violations of licensing agreements. He also had the normal accouterments of estate administration to deal with including the investment of monies, the filing of substantial tax returns, related bookkeeping, etc.

**B. The Experts.**

In support of his case, the Trustee called four persons to testify as to the reasonableness of the fees requested. Harris tendered the testimony of one expert. As expected, the Trustee's experts all concluded that the Trustee is entitled to the fee that he seeks. The Harris expert concluded that the fee requested is excessive and should be reduced to a fee in the range of $595,000 to $818,750.

Rule 702 of the Federal Rules of Evidence provides the basis upon which the court can receive the opinions of experts as evidence at trial. That rule provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702.

The United States Supreme Court has addressed the application of this rule in two significant opinions. The first is the Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). There the Court was concerned with the application of Rule 702 in the context of opinion testimony from a doctor who was opining on the health risks from exposure to chemical substances. This was in the nature of "scientific" knowledge being imparted by the doctor. The Supreme Court held that, before admitting such opinions into evidence, the trial court has a gate-keeping function. The court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." *Daubert*, 509 U.S. at 597, 113 S.Ct. at 2799.

Left unanswered in *Daubert*, as observed by Justice Rehnquist in his concurring/dissenting opinion, *Daubert*, 509 U.S. at 600, 113 S.Ct. at 2800, was the question of whether the *Daubert* gate-keeping requirement applied only to scientific opinions but also to an expert opining on the basis of "technical or other specialized knowledge." That question was answered by the Supreme Court in its more recent opinion in *Kumho Tire Co., Ltd. v. Carmi-*

*chael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

In *Kumho*, the proffered expert was called to opine that a particular tire had failed due to a manufacturing or design defect. The Court held explicitly that the *Daubert* gate-keeping obligations apply to all expert testimony. The trial court must evaluate whether the proffered testimony has some reliable foundation in the relevant discipline, and *the discipline itself must have some reliability*. As the Supreme Court observed: "Nor, on the other hand, does the presence of *Daubert's* general acceptance factor help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy." *Kumho*, 119 S.Ct. at 1175.[7] It is against the backdrop of *Daubert* and *Kumho* that this Court must now examine and evaluate the opinions expressed by the designated "experts" in this case.

Certain of the expert opinions can be dealt with summarily. The Trustee proffered the opinions of Mr. Weinman, Mr. Sender and Ms. Jagow. Each is an attorney and a member of the panel of trustees who serve in this district. Each is an able and respected practitioner. Their opinions, however, are of no value to the Court. They offer a relatively perfunctory analysis and no particular expertise. They conclude in summary form that the fee sought by the Trustee in this case is reasonable. The opinions are wholly self-serving and reflective of the self-interest of these experts in establishing a per se rule in this jurisdiction that the maximum fee permitted by section 326 is, in fact, the minimum fee that should always be allowed.

Harris proffered the opinion of Thomas Seawell, Esq. Mr. Seawell is a respected

---

7. The dictionary defines "necromancy" as "the practice of communicating with the spirits of the dead in order to predict the future; black magic; sorcery." American Heritage Dictionary, 2d College Ed. (Houghton, Mifflin Co., 1985). One might observe that the fixing of fees under section 330 of the Bankruptcy Code is a similarly arcane process lacking any semblance of reliability or predictability.

and experienced attorney who practices before this Court. His foundation reflects that he has testified as an expert on attorney fee matters on a number of occasions and is, by his declaration, familiar with the fees generally charged by attorneys in this community who practice before this Court. Despite this proclaimed expertise, the Court would observe that Mr. Seawell's credentials do not reflect any general familiarity with the compensation customarily paid to trustees for their services. Mr. Seawell has never served as a trustee nor, apparently, ever represented a chapter 7 trustee.

Mr. Seawell. starts from the premise that the estate administered by the trustee in this case was only $31,000,000 and not the $101,000,000 asserted by the Trustee. That view significantly colors the conclusions reached and the opinion rendered by Mr. Seawell. His opinion is really premised on his view that the fee sought by the Trustee extrapolates to an hourly rate of $1,712 per hour. Mr. Seawell recommended that the Trustee be awarded a fee premised on a premium hourly rate of $1,000 to $1,500 for the 300 hours directly expended on the district court litigation. The remainder of the Trustee's time should be allowed at a rate of $200–$250. With that analysis, Mr. Seawell concluded that the fee should be in the range of $595,000 to $818,750.

·The Tenth Circuit Court of Appeals has signified its relative disdain for the type of opinions tendered by the various experts. In discussing the allowance of fees and the need for meaningful evidence, the Tenth Circuit has stated: "While the district court will need evidence of local hourly rates, we agree with the court below that the practice of presenting experts to testify as to the total fee that should be awarded in a given case is not very helpful." *Ramos v. Lamm*, 713 F.2d 546, 555 n. 6 (10th Cir.1983).

■ This Court concurs with the views of this circuit. While Mr. Seawell may represent some level of expertise as to whether a given attorney's hourly rate is consistent with rates generally charged in the community, his opinion as to the fee to be paid to the trustee herein, in actuality, is no more "expert" than the legal argument propounded by counsel for Harris from the podium in the courtroom. Mr. Seawell's opinion does not consider all of the *Johnson* factors, nor does it consider whether compensation in this case might better follow the common fund approach. Finally, there is nothing in his opinion that addresses the 330(a)(1) question of the "cost of comparable services other than in a case under this title; ..." 11 U.S.C. § 330(a)(1).

The Trustee's primary expert witness was Ford Elsaesser. Mr. Elsaesser came before the Court with an impressive resume. He has had extensive experience as a chapter 7 trustee in Idaho handling some 7,000 cases, albeit none in any way approaching the size or complexity of the MiniScribe estate. Indeed, by his estimate, the highest fee that he has ever received as a trustee was approximately $100,000. Mr. Elsaesser also serves as the standing chapter 12 trustee in Idaho and in the Eastern District of Washington. He is currently serving as the president of the American Bankruptcy Institute. He has written and spoken on fee issues in bankruptcy on an extensive basis. He has also served as a fiduciary in other types of proceedings, such as state court receiverships and as a personal representative in the decedent's estate.

Mr. Elsaesser opined that "the section 326 maximum would be the normal customary fee for trustees as provided here." He also opined that, in comparable circumstances other than in bankruptcy, such as a personal representative in an estate or a state court receiver, the fee would be on a percentage basis equal to or greater than the 326 cap.

While Mr. Elsaesser comes the closest of any of the experts in trying to address the standards set forth in section 330 of

the Code, and particularly those of 330(a)(1), there are a number of problems with his testimony. These include:

(1) While Mr. Elsaesser advises that he himself has served in similar capacities in non-bankruptcy proceedings, he neither provides any information about those proceedings nor discloses the compensation that he has received or the basis upon which it was determined in such proceedings.

(2) As was true of the Trustee's other experts, Mr. Elsaesser's own self-interest in the issue diminishes the credibility of his views.

(3) His experience comes from outside this district. This is significant because to the extent Mr. Elsaesser infers that personal representatives of decedent's estates are paid on a percentage basis, that practice is not followed in Colorado. The standards for allowing fees to a personal representative are set forth in the Colorado statutes at C.R.S. § 15–12–721 (1999). They essentially mirror section 330 of the Bankruptcy Code. In commenting on the adoption of the Colorado Probate Code and the abandonment in this state of the percentage method of compensation, the Colorado Court of Appeals has stated:

The percentage method which existed in the statute prior to enactment of the CPC was based upon the premise that the amount of work required in estate administration is directly proportional to the value of the assets. The General Assembly recognized the error of this premise when it enacted the CPC accepting the reality that the duties of a personal representative and those employed by him, if any, vary greatly depending upon numerous factors, only one of which is the monetary value of the estate. *Colora-*

*do State Board of Agriculture v. First National Bank of Greeley, (In the Matter of The Estate of Austin M. Painter)* 39 Colo.App. 506, 507–508, 567 P.2d 820, 822 (1977).

There is another fundamental problem with the testimony of Mr. Elsaesser and it pertains to a misapprehension by counsel as to the use and purpose of an expert. In closing argument, counsel for the Trustee advised the Court that Mr. Elsaesser had been called as an expert for the purpose of telling the Court what was a customary fee in other kinds of proceedings.[8]

To have Mr. Elsaesser, or any of the other experts, testify from the witness stand concerning the rates paid in other proceedings is nothing other than unadulterated hearsay. It is particularly suspect when it is offered up in the form of broad generalities without even any reference to specific cases or instances.

■ The rules of evidence recognize that it is permissible for an expert to rely on facts or data that, like hearsay, may not be admissible in evidence provided it is "of a type reasonably relied upon by experts in the particular field in forming opinions...." Fed.R.Evid. 703. The practice of a real estate expert's reliance on records of other sales transactions is illustrative. But, this cannot be used as a vehicle to the introduction through the lips of the expert of the hearsay evidence for the purpose of establishing the truth of the facts or the data relied on. *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732–33 (10th Cir.1993); *Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254 (9th Cir.1984); *In re CSI Enterprises, Inc.,* 220 B.R. 687 (Bankr.D.Colo.1998); *Emerging Problems Under the Federal Rules of Evidence, Monograph of the American Bar Association Section of Litigation,* p. 181 (West Publ. 1991).

The Court concludes that the evidence of the type proffered by the parties

---

**8.** A similar attempt was made in the declarations of Mr. Sender and Ms. Jagow when they proffered their opinions that corporate trustees and fiduciaries and executors of probate estates charge fees based on a percentage of the value of the assets administered.

through the panoply of experts lacks the sort of reliability predicated on a reliable foundation in a relevant discipline (that itself has some reliability) that the Supreme Court has mandated as a condition to serious consideration by this Court. It is more in the nature of anecdotal hearsay evidence or pure legal conclusions that can as well be, and were, presented by counsel in their arguments. The opinions are neither helpful nor persuasive.

## IV. THE BANKRUPTCY ESTATE

■ One of the primary points of contention between the Objectors and the Trustee concerns the size of the bankruptcy estate that was administered in this case. The Trustee's final report declares that he received and will have disbursed to parties in interest $101,492,456. The Objectors assert that the more representative figure is $31.5 million[9]. The argument revolves around the interpretation and effect of the settlement agreements that were entered into to resolve the fraud litigation.

As discussed above, there were at least five separate actions that found their way to the United States District Court for the District of Colorado seeking damages for the fraud that had been perpetrated at MiniScribe. In addition to the action brought by the Trustee, there was an action on behalf of a limited class of shareholders, an action by SCB, one by ELLCO, and one that involved the claims of four subordinated debenture holders. Each action was being vigorously prosecuted by their separate attorneys.

The Trustee viewed his case as being all inclusive and ultimately the district court agreed. By an order of April 15, 1992, the Trustee's case was selected as the lead case to go to trial, with the trial set for June 8, 1992 (Trustee Exhibit 2). This may in fact have been a calculated decision by Chief Judge Matsch to posture the cases in a position that was most likely to lead to a negotiated resolution.

Up until the time that the Trustee's case was pushed to the head of the trial docket, settlement negotiations were not making much progress. It appears that this was largely due to the position of the defendant accountants that their obligations as accountants ran to the company and its shareholders and not to creditors. Thus, the accountants were reluctant to talk settlement with parties such as SCB, ELLCO and the debenture holders. The Trustee became the vehicle to resolve that impasse.

The Trustee was left with a multifaceted negotiating process. On the one hand, he had to negotiate with the defendants to try to raise a settlement pool. This of necessity also involved the shareholder class. The Trustee and the shareholder class had a common interest in bringing the defendants to the table and extracting the maximum amount of dollars possible to settle the various claims. They ultimately were successful in getting the defendants to commit to a total settlement fund to be contributed by the defendants collectively in the amount of $128.1 million.

In addition, the Trustee had the challenge of negotiating an allocation of the available settlement proceeds among the competing factions because key to any possible settlement with the defendants was the requirements that all of the pending fraud actions be dismissed. An early suggestion by the Trustee that he administer all of the settlement proceeds was quickly rebuffed by class counsel and not pursued. Thus, the negotiations required first that the Trustee and class counsel reach an agreement acceptable to all on the way the gross settlement dollars should be allocated between the shareholder class and the creditors. This was ultimately resolved by allocating $44 million to the shareholder

---

9. The Trustee brought to issue the *raw* calculation of the section 326 cap in his Motion for Partial Summary Judgment. This Court granted the Trustee's motion but left open the issue of whether there might be other grounds upon which the allowed fee would be less than that permitted by the cap.

class, leaving $84.1 million for the remaining contending parties.

The negotiations were complicated by several factors. First, at the time the negotiations were going on, there had been no determination of the allowed amount of the creditors' claims in the MiniScribe estate. Second, there was the effect of the subordination agreement. SCB, ELLCO, the trade creditors and the subordinated debentures were all general unsecured claims. Thus, any distribution from the estate would have to be allocated pro rata among those claims. However, because of the subordination agreement, to the extent SCB and a small portion of the ELLCO debt was not paid in full, they were entitled to receive money from the funds allocated to the debenture holders until full payment was achieved.[10] Third, the four debenture holders who had filed their own suit, were not apparently actively involved in the negotiation process and were not signatories to the ultimate settlement agreement. Their claims had to be dealt with and resolved. Fourth, because SCB and ELLCO had separate lawsuits, they were not going to be content to have all of the settlement dollars paid into the estate to be held for some indeterminate time by the Trustee before distribution on their claims. If there was going to be a pot of cash on the table, those creditors wanted their share immediately.

The Trustee, for his part, was concerned that any the settlement that was reached had to permit some money to flow to the debenture holders. There was the risk that the debenture holders could end up with no distribution. That risk was difficult to quantify because it was affected by unknowns such as the size of the pot, the actual amount of the to-be-allowed trade claims and the recoveries from the other pending litigation.

The conundrum was ultimately resolved by two documents, the Settlement Agreement (Trustee's Exhibit 3), and the Distribution Agreement (Trustee's Exhibit 4). The Settlement Agreement resolved the issues between the claimants on the one hand, and the defendants on the other and fixed the settlement pool of $128.1 million.[11] These funds were then to be allocated as follows: $4.1 million to the four suing debenture holders in return for a dismissal of their lawsuits, assignment by them to the Trustee of their debentures and a release of any claims against the estate; $44 million to the shareholder class; and the balance of $80 million to the estate. The Trustee, SCB and ELLCO also released their claims against the defendants and dismissed their litigation.

In order to allocate the funds among the creditors, the Distribution Agreement was entered into and approved by the bankruptcy court. It is a unique agreement. It fixes the distributive share to be paid to the parties in the bankruptcy case in advance of any final determination of the allowed claims and before all of the assets were collected. In negotiating the Distribution Agreement, the Trustee provided that all of the settlement dollars paid by the defendants (other than those allocated to the shareholder class, but including the $4.1 million allocated to the suing debenture holders) would be property of the bankruptcy estate to be received and distributed by the Trustee. According to the

---

10. The Trustee also expressed concern that the senior debt (SCB and a portion of ELLCO's debt) would assert a right to receive from the debentures' share payment of post-petition interest on the senior debt. Given the state of the law in this circuit, that concern may have been misplaced. *See, In the Matter of King Resources Co.,* 528 F.2d 789 (10th Cir.1976). However, the potential arguments of able and inventive counsel for the senior debt cannot be wholly discounted.

11. Some of the payments were to be deferred and interest was to accrue. The accrued interest was then to be allocated and paid out to the claimants as specified in the settlement agreement. For purposes of this opinion, the interest distributions are not germane and are ignored. That omission may result in some of the figures not exactly tying together.

Trustee, this was consistent with his view that his claims against the defendants in his litigation encompassed all of the debt owed by MiniScribe.

The Distribution Agreement provided the vehicle by which the Trustee endeavored to assure that the debenture holders would receive something out of the settlement proceeds. This was accomplished by convincing SCB to reduce its general unsecured claim from $65.5 million to $60 million and ELLCO to reduce its claim by $1 million to $5.5 million. The Distribution Agreement then provided that 90% of the $80 million in settlement proceeds would be used to pay SCB $60 million, ELLCO $5.5 million and the debenture holders approximately $6.5 million. In return, SCB and ELLCO were to release all of their general unsecured claims against the estate. The remaining 10% of the settlement proceeds were to be allocated to the payment of general unsecured claims. The settlement fund bore none of the costs of administration of the estate.

The Distribution Agreement also dealt with the future disposition of all of the other assets of the estate. These funds, whatever they were, were to be used to pay first the super priority administrative expense claims of SCB and ELLCO in the aggregate amount of $2,293,565, then the bankruptcy administration expenses, then other priority claims, and the balance allocated 15% to the payment of the other general unsecured claims and 85% to the debenture holders.

As matters evolved, the allowed claims of the trade creditors were reduced to less than $9 million, a figure considerably lower than had been anticipated at the time the Settlement and the Distribution Agreements were negotiated and approved. Also, the funds realized from other recoveries were more than expected. The result is that the subordinated debenture holders now stand to receive less out of the estate than they might have received had the aggregate dollars been allocated at the end of the case strictly in accordance with the priorities mandated by section 726 of the Code. On the other hand, such a delay in distribution was not an alternative and, had it been insisted on, might have been the death knell to the entire settlement. Speculation on "what might have been" is not fruitful. As the case now stands, the total available dollars have been paid or allocated as follows.

| | | (In Millions) | | |
|---|---|---|---|---|
| 1. | Settlement Fund ($80 million + interest) | | | |
| | 90% | | | |
| | Standard Chartered Bank | $60.366 | | |
| | ELLCO | 5.526 | | |
| | Indenture Trustee | 6.519 | | |
| | | | 72.411 | |
| | 10% | | | |
| | Other unsecured creditors | 8.000 | | |
| | | | 8.000 | |
| | Settlement Fund Total: | | | 80.411 |
| 2. | General Fund ($16.981 million) | | | |
| | Paid | | | |
| | Chapter 7 costs of admin. | 7.618 | | |
| | Chapter 11 costs of admin. | 3.776 | | |
| | Priority claims | .225 | | |
| | Other unsecured creditors | .351 | | |
| | | | 11.970 | |
| | Balance on hand | | | |
| | Requested by Trustee Proposed Indenture | 1.795 | | |

|  | Trustee distribution | 3.216 |  |
|---|---|---|---|
|  |  | 5.011 |  |
|  | General Fund Total: |  | 16.981 |

3. Received and distributed to Non–Signing Plaintiffs 4.100

TOTAL ON TRUSTEE'S FINAL REPORT ........$101.492

The Objectors assert that, in reality, the Trustee was ultimately responsible for administering an estate of approximately $31 million dollars. In their view, the distribution to the non-signing plaintiffs of $4.1 million, the payment of $60 million to SCB, and the $5.5 million paid to ELLCO, ought not to be included and considered as part of the estate. The Court does not agree.

In part, the Objectors' argument revolves around the reality that SCB and ELLCO had separate lawsuits and separate counsel. The attorneys for these parties were able and capable of pursuing the separate claims of their clients. Thus, Objectors argue the Trustee cannot take credit for the settlement that brought more than $65 million to these creditors. Further, they assert that there was no good reason for these funds to flow through the bankruptcy estate other than to artificially inflate the Trustee's available cap under section 326 of the Code.

It is true that SCB and ELLCO had their own counsel, as did the shareholder class, and all were involved in the negotiations, but that does not mean that the Trustee played no part in negotiating the settlement that resulted in funds being available to pay the claims. To the contrary, every indication is that the Trustee was the catalyst and took the lead in these negotiations.

It is also apparent to the Court that there were good reasons for the Trustee to control the disbursement of the funds. The claims of SCB and ELLCO in their lawsuits were tort claims premised on fraud. While those claims were co-extensive with the debt owed the claimants by MiniScribe, it was important to the administration of the estate that the claims of SCB and ELLCO against the estate be satisfied. Certainly no one wanted SCB and ELLCO to pocket some $65.5 million from the defendants and also seek in some fashion to pursue their claims against the estate. These issues all needed to be resolved and the place to do that was property in the administration of the bankruptcy estate. That was best accomplished treating the settlement dollars as property of the estate, all to be distributed by the Trustee to "parties in interest."

█ The same is true as to the $4.1 million paid out to the non-signing plaintiff debenture holders. Pursuant to the Settlement Agreement, these funds were to be paid directly to these plaintiffs. However, the Distribution Agreement contemplated that these dollars would flow through the bankruptcy estate as well. These debenture holders had not filed individual proofs of claim in the MiniScribe estate but their claims were included in the umbrella claim filed by Harris for $97.5 million on behalf of all of the debenture holders. These parties, then, were clearly parties in interest. The funds to pay them were indeed disbursed by the Trustee, and with good reason because, in exchange for the payment, the plaintiffs' debentures were surrendered and the potential claims against the estate were released. Despite the Objectors' arguments, the Court perceives nothing nefarious in the way in which this was accomplished by the Trustee. Finally, Objectors point to the fact that the settlement funds were paid to the Trustee and were then immediately disbursed out. They argue that this is further evidence of the reality that the funds were never part of the bankruptcy estate. But the fact that the money sits in the trustee's account for some extended period is not the key to the question of whether it was administered by the trust-

ee. For example, when property that is encumbered is sold by a trustee, the encumbrance is commonly paid by the trustee at the time of sale. Nevertheless, section 326 clearly includes those funds as monies disbursed by the trustee. They are part of the cap. It is true that, in certain circumstances, the courts will allow less than the full 326 cap in that kind of case where it appears that the only justification for the trustee's sale of the property was to enhance his fee cap. But, the Court does not believe this is that kind of case. There was ample reason here, as explained above, for the Trustee to handle the funds as he did.

The suggestion by Objectors is that, by allocating the whole $84.1 million to the estate, SCB, in particular, and ELLCO, to a degree, do not bear any part of the cost of the litigation.[12] Such is not the case, however. SCB, in particular, reduced its senior debt claim by more than $5 million, and ELLCO reduced its claim. Those funds dropped almost entirely into the pocket of the debenture holders. It was the price SCB and ELLCO paid to accomplish the settlement and, indirectly, contributed to the payment of the administrative costs.

The Court concludes that, when evaluating for purposes of section 330 the size and complexity of the estate, it is appropriate to consider this as a $101.492,332 estate. Similarly, for the purpose of applying the cap under section 326, the Trustee has, or will have, upon the closing of this case, disbursed that amount to parties in interest.

---

12. Earlier in this case, the Trustee and his attorneys, Dufford & Brown, filed an application to pay the lawyers a $500,000 bonus. This was after the firm had filed and had been allowed its final fee application and the fees, as allowed were paid. The request for a bonus was denied by the Court. In doing so, the Court made some comments on the record to the effect that the attorneys' services had not been responsible for the recovery of the $84.1 million, but only that portion that went to the debenture holders and the trade creditors. Harris argues that these findings

## V. EVALUATION OF THE FEE

### A. General.

Despite the plea of Trustee's counsel that section 326 of the Code establishes the fee to which the Trustee is entitled, the law is clear, as discussed above, that the Trustee's fee must be a reasonable fee fixed by the Court pursuant to the standards mandated by section 330 of the Code. The Court has concluded that, in fixing the fee, the Court must consider both the lodestar, adjusted by the factors outlined in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974) and the approach used by the courts in fixing fees in the "common fund" cases.

### B. The Lodestar Analysis.

In *Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983), the Tenth Circuit established the standards for the award of fees in civil rights cases. As discussed above, those standards now apply, as well, to virtually any type of fee award that is to be made by a court. *Ramos* acknowledged the applicability of the *Johnson* factors and explained their application. As set out in *Ramos*, the Court is to engage in a lodestar analysis to determine the time reasonably necessary for the matter, and apply to that an appropriate hourly rate. That lodestar fee can then be adjusted, taking into account the various *Johnson* factors. *Ramos v. Lamm,* 713 F.2d at 557; *Gottlieb v. Wiles,* 150 F.R.D. 174, 184 (D.Colo. 1993), *rev'd on other grounds, Gottlieb v. Barry,* 43 F.3d 474 (10th Cir.1994).

---

are pertinent here. However, those comments were pure dicta. The Court denied the request for a bonus for the attorneys because they had contracted to represent the Trustee at their hourly rate. The Court could not find that this agreement was improvident when made and thus the Court had no basis on which to change the agreed terms and dole out more dollars to the lawyers. 11 U.S.C. § 328. Further, the comments were made on the basis of a much abbreviated factual record.

The lodestar analysis has come to be recognized as being perhaps the most objective, but also perhaps the most suspect, of any approach to the award of professional fees. The Tenth Circuit has recognized that counting hours is not always the best measure of the value of services that were provided. *Gottleib v. Barry,* 43 F.3d at 478 n. 3. Other criticism has been noted. For example:

A primary criticism lodged against hourly billing is that the system neither encourages nor rewards efficiency. Legal services are a significant expense for many clients. Because most clients succeed in their own businesses by accurately predicting and controlling costs and expenses, they do not understand why the cost of tasks performed by lawyers are difficult to predict. Some critics attack hourly billing as causing lawyers to engage in potentially unethical activity that does not serve client goals. For example, there are fears that lawyers may conduct excessive interoffice conferences, overstaff matters, conduct unnecessary research, focus on premature or immaterial issues, and even delay—or at least have too little incentive to accelerate—resolution of disagreements. Gentler critics acknowledge that any such vices of the hourly charge may be unconscious, while the more caustic claim evil intent, but in either case the culprit is asserted to be a culture that rewards quantity of hours worked rather than efficiency and quality of effort or result. American Bar Association Committee on Lawyer Business Ethics, *Business and Ethics Implications of Alternative Billing Practices: Report on Alternative Billing Arrangements,* 54 Bus.Law. 175, 176 (Nov.1998).

Notwithstanding its suspect value, the Court is obligated to evaluate and consider the lodestar, adjusted, if appropriate, by the relevant *Johnson* factors, and will do so.

1. *The Time Necessary for the Task.* The Trustee and his staff did, in general, keep track of the time that was spent in the administration of the estate[13]. The Trustee's time records were part of his fee application. They reflect that Mr. Connolly spent a total of 1,779 hours on the case, and his paralegals spent an additional 1,347 hours. There were a nominal number of hours spent by junior attorneys employed by Mr. Connolly.

It is unfortunately true that the lodestar analysis typically is a quest by the opposing party and the court to examine a fee applicant's time records, and to extract from those records time that was not efficiently or well spent. *See, e.g., Mares v. Credit Bureau of Raton,* 801 F.2d 1197 (10th Cir.1986); *Case v. Unified School Dist. No. 233,* 157 F.3d 1243 (10th Cir. 1998); *In re Lederman Enterprises, Inc.,* 106 B.R. 674 (Bankr.D.Colo.1989). In the course of that exercise, never does it occur that the court examines what was done and the time expended, only to conclude that the time expended was unreasonably low! As the ABA Report, quoted above, observes, this system "neither encourages nor rewards efficiency."

The Objectors do not take umbrage with the Trustee's time. Mr. Seawell, the Harris expert, did endeavor to segregate the time and concluded that, of the total time recorded, approximately 300 hours were spent in the negotiating and structuring of the fraud settlement. That is exclusive of approximately another 100 hours of time spent in obtaining the approval of the agreements. This time was all spent between April 1991 when the Trustee was appointed, and October 1992, when the Distribution Agreement was approved by the Court.

---

**13.** At the time of his appointment, the Trustee was employed by a large law firm. Pressures existed because the administration of MiniScribe was absorbing a substantial amount of time without immediate recompense. As a result, the Trustee testified he frequently worked on MiniScribe matters at night or on the weekends and did not record the time.

The real problem with the Trustee's time is that he was **too efficient.** Had the litigation dragged on, or had the district court delayed in pushing the cases toward trial, the hours could have expanded exponentially without objection or a claim of unreasonableness. That efficiency can be attributed to several factors. Unquestionably, the decision of the district court to set the Trustee's case for a prompt trial, and his referral of the matter to a magistrate judge for settlement negotiations, contributed. Contributions also came from the Trustee's counsel who had diligently prepared the case for trial. And, substantial contribution came from the professionals engaged by the other litigants, most notably counsel for the shareholder class. But the Court cannot lose sight of the fact that the Trustee himself acted efficiently and expeditiously in achieving the settlements and effecting an early distribution of funds to the creditors.

■ 2. *Reasonable Hourly Rate.* Evaluation of this factor may be the most difficult of all. The Court has little, or no, guidance from the evidence.

The Trustee's experts have all testified that bankruptcy trustees are not paid on an hourly basis. Mr. Elsaesser testified that it is appropriate for the Court to consider the number of hours expended (as, indeed, section 330 mandates), but the Court ought not to fix an hourly rate. The Trustee similarly testified that he did not believe he should be compensated based on an hourly rate. Mr. Seawell opined that it would be reasonable to compensate Mr. Connolly at a rate of $1,00 to $1,500 an hour for the 300 hours spent on the fraud litigation, but at a rate of $200 to $250 an hour for the remaining time (which would be a rate generally consistent for attorneys of like experience in the bankruptcy practice in this jurisdiction, handling similarly complex matters).

■ The arguments of the Objectors are all generally framed around the assertion that the Trustee should be compensat-

ed at some hourly rate that bears some reasonable relationship to the rate charged and allowed for attorneys. The problem with this analysis is that, while Mr. Connolly is, indeed, a practicing lawyer, there is nothing in the Code that mandates that trustees must be lawyers. It is not the role of the trustee to provide legal services. It is the role of the trustee to act as the fiduciary for the estate. He is the estate's chief executive officer and its chief financial officer with, as Mr. Elsaesser testified, full responsibility for the assets and affairs of the estate, a responsibility that he cannot delegate. On balance, the Court concludes that to allow an hourly rate for the services of the Trustee in this case of $500 would not be unreasonable.

3. *The Lodestar Fee.* At the designated hourly rate of $500, as applied to the 1,779 hours reasonably expended by the Trustee, the lodestar fee is $889,500.00

## C. The Pertinent *Johnson* Factors.

■ The *Johnson* factors include an analysis of the time expended and the "customary" fee, which itself may address the appropriate hourly rate. These factors are subsumed within the Court's lodestar analysis. The remaining *Johnson* factors, to the extent pertinent are:

1. *The Novelty and Difficulty of the Issues.* The Court has already discussed many of the difficulties that were encountered in this case by the Trustee. At the outset he had to convince the attorneys to keep working, even though funding for the litigation costs was far from assured. He had to become enmeshed in the merits of the litigation so that he could effectively supervise and guide the attorneys in their work. The fraud case itself was unique and the merits were uncertain. The negotiations for the settlement of the fraud case involved not only resolving the contribution of the defendants, but the allocation of the fund among the various claimants. The structure of the settlement agreement and the distribution agreement were, themselves, unique both in their form and

in what they accomplished. These were novel and sophisticated problems that transcended the normal bankruptcy case. Added to those problems were the other matters such as the Sunward settlement, the number of significant recovery actions, the massive number of claims and the general administrative problems of an estate this size.

2. *The Requisite Skill.* An attorney must bring to his project the requisite legal skills to perform the job required. But, the attorney has a client to make the ultimate decisions. The attorney can prepare the case for trial, and can evaluate the prospects for success and the legal merits of a proposed settlement. But, the attorney does not have the burden of deciding whether the settlement is fair and reasonable for the client. The client must make that decision.

The Court here is not evaluating the skill required of the attorney, but of the Trustee, the fiduciary in the case. The Trustee had to bring to his position the skills of a consummate negotiator, one who could converse with conviction and credibility with both sides. He had to be inventive, able to evaluate the litigation risks and costs, the fairness to the creditors, the prospects for collection, etc. In short, he had to bring with him the skills of the chief executive officer. To him fell the burden of the final decisions. On him was the risk of pushing the defendants too far, or leaving too much on the table. These are skills learned after years of experience, and it was clear from the testimony of those who were involved with the Trustee in the litigation that he brought these skills to the table, and they were recognized and appreciated.

There are some countervailing considerations. As Mr. Elsaesser acknowledged, this was not a case where the Trustee inherited hard assets that had to be managed, environmental claims to be dealt with, difficult insurance claims and coverage, etc. Here, the Trustee had only to

manage the litigation and the consequent dollars.

3. *The Preclusion of Other Employment.* The Trustee did not indicate that the prosecution of this case necessarily precluded him from handling other matters. But, it did have a direct impact on his professional career. He testified that when he took on the job as Trustee, he was employed as an attorney with the Gibson, Dunn law firm. The amount of time he had to devote to the MiniScribe case, and the number of support persons he absorbed in doing so, became a point of contention because of the deferred, if not uncertain, payment. As a result, the Trustee ultimately resigned from the Gibson, Dunn firm.

4. *The Contingent Nature of the Fee.* In a sense, serving as a Trustee always is a contingent undertaking. Payment is subject to the availability of funds in the estate. MiniScribe was no different. When the Trustee was appointed there was less than $150,000 in the estate, all of the hard assets had been sold, there were substantial superpriority expense claims, the litigation costs were escalating, and the only source for payment was the various lawsuits. On the other hand, the various adversary proceedings for the recovery of preferences and other prepetition transfers had, on their face, some merit. Nonetheless, substantially all of the recoveries in these actions could have been absorbed had the fraud case gone to trial and to appeal, and perhaps nothing would have been recovered. There was a significant risk of nonpayment when the Trustee started.

5. *Time Limitations.* Bankruptcy cases are to be administered as expeditiously as possible. 11 U.S.C. § 704(1) This case presented no abnormal time constraints except in connection with the settlement of the fraud case. There, all of the participants were subject to the time demands imposed by the order of the court setting the case for trial. This had a direct impact on the pressures. The set-

tlement was ultimately concluded in a week long negotiating session in New York among all of the interested parties. This was attended by the Trustee by himself, without counsel, and he had the lead in the negotiations. For those who have never been involved in the pressures of around the clock negotiations, living out of a suitcase, eating at odd hours, dealing with contentious issues and contentious people, it is not possible to describe adequately the price that is paid, physically and mentally.

6. *The Amount Involved and the Results Obtained.* This was a large case, by any measure. Indeed, it was the largest chapter 7 case that has ever been administered in this district, and one of the largest in the country. That fact alone makes it difficult to evaluate the fee request in this case because there is no precedent available. As to the results obtained, they largely speak for themselves. This Trustee took a moribund, insolvent estate and directed it toward a full distribution to the senior debt holders on their settled claims, payment in full of the Trade claims, payment of all administrative expenses, and a significant payment to the subordinated debenture holders. More could hardly have been asked.

7. *Experience, Reputation and Ability of the Trustee.* Mr. Connolly has served as a Trustee in this District for many years. He is highly experienced and extremely able, both in his role as trustee and as an attorney practicing before this Court. He has demonstrated a considerable expertise in resolving matters without the necessity of costly and time consuming considerable expertise in resolving matters without the necessity of costly and time consuming litigation. He enjoys a most favorable reputation with the Court and with his peers.

**D. The Adjusted Lodestar.**

The Court has concluded that the appropriate lodestar fee in this case would be $500 an hour for the Trustee's 1,779 hours. That equates to a fee of $889,500. That would be, in this Court's view, a reasonable fee in a relatively ordinary case. But this case was anything but ordinary. Considering the various *Johnson* factors, as discussed above, and the efficiency with which the case was administered, the Court concludes that an appropriate multiplier in this case would be 3.5 times the lodestar, or a fee of $3,113,250.[14]

**E. Common Fund Analysis.**

The estate administered by the Trustee was, in gross, $101,492,456. The aggregate administrative expenses, assuming the Trustee is allowed his claimed fee of $3,044,954 and expenses of $40,563, will be $13,189,442. However, that figure includes adequate protection payments, or other administrative payments, made to SCB and ELLCO in the aggregate of $2,325,040, and those payments ought not to be included in evaluating the true cost of raising and administering the "common fund." The better comparison figure for administrative costs is $10,864,402, which is approximately 10.7% of the total funds administered by the Trustee.

In the parallel shareholder class action, the ultimate award upheld by the circuit was an allowance to class counsel of an aggregate of 22.5% of the recovery, an award that the circuit found was "well within the range of permissible reasonable fee awards, and is reasonable in this case." *Gottlieb v. Barry,* 43 F.3d at 487–88. Applied to the case now before the Court, it would allow for aggregate administrative costs in this bankruptcy case of something in excess of $23,000,000. However, application of the *Gottlieb* 22.5% is not appropriate in the case before this Court. That

**14.** By comparison, in doing a lodestar analysis for the purpose of the fee allowance to class counsel in the parallel shareholder class litigation, the district court employed a multiplier of 2.57. *Gottlieb v. Wiles,* 150 F.R.D. 174 (D.Colo.1993), *rev'd on other grounds, Gottlieb v. Barry,* 43 F.3d 474 (10th Cir.1994).

fee presumes that there has been a common fund, and that all parties receiving payment through the fund would bear a proportionate part of the costs.

When this Court denied the application to pay D & B a bonus, one of the factors that was of concern to the Court was that it appeared that SCB and ELLCO did not share in that burden. The Court's analysis there was not wholly correct, as the present record makes clear and as discussed above. In point of fact, SCB and ELLCO have contributed because they agreed, between them, to reduce their total claims of approximately $72 million to an aggregate of $65.5 million, a reduction of approximately 9.1%. That reduction went directly into the pockets of the holders of the subordinated debentures, bypassing any requirement to bear any of the costs of administration in this estate.

If this Court allows the Trustee his requested fee of $3,044.953, the total applicable administrative expenses herein, as stated above, will approximate 10.7% of the estate. Compared to the *Gottlieb* allocation, this is a reasonable cost to administer this inordinately complex proceeding. The Court also finds that these costs have been fairly allocated among the participants in this proceeding in light of the contributions made by SCB and ELLCO. That the subordinated debenture holders bear a disproportionate burden is simply reflective of the realities of their agreement to see to it that senior debt was first paid.

### VI. THE FEE AWARD.

The Court has considered both the common fund approach and the lodestar analysis. Under either, the Court concludes that a reasonable fee to the Trustee for his services in this case would be equal to or greater than that permitted by section 326 of the Code. Accordingly, it is

ORDERED, that Tom H. Connolly, Esq., is allowed a fee pursuant to 11 U.S.C. § 330, for his services as Trustee herein, in the amount of $3,044,953.69, and

reimbursement of his out-of-pocket expenses of $40,563.09. Judgment shall enter accordingly.