**In re NORTH AMERICAN OIL & GAS, INC., Debtor.**

**Bankruptcy No. 88–10358–C.**

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

Oct. 19, 1990.

Adrian M. Overstreet, Overstreet, Winn & Edwards, P.C., Austin, Tex., for debtor.

Stephen A. Roberts, Austin, Tex., for trustee Robert Moffitt.

## OPINION AND ORDER

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the application of Robert Moffitt, chapter 11 trustee in this case, for compensation under Sections 326(a) and 330(a) of the Bankruptcy Code. Also considered at the same hearing was the Trustee's Final Report and Accounting. The liquidating agent under the confirmed Chapter 11 Plan filed an objection. Upon consideration thereof, the court finds and concludes as follows:

### BACKGROUND HISTORY

This bankruptcy was filed in early 1988. Shortly thereafter, amid allegations of fraud, mismanagement, and violations of securities laws, a chapter 11 trustee was appointed by the court.[1]

The chapter 11 trustee, one Robert J. Moffitt, has experience in oil and gas bankruptcy cases. He was the disbursing agent in two bankruptcy cases and the liquidating agent in another. He was also the court appointed president of another debtor oil company. Moffitt had offices in Houston, Texas, and he moved the debtor's operations there from Austin shortly after taking over. He used his staff, hired more (including his son at one point), and employed some North American Oil and Gas ("NAOG") employees as well to run the operation. The fifteen months Moffitt operated the estate cost an estimated $972,-000.

---

1. The Hon. R. Glen Ayers, Jr., was the then presiding bankruptcy judge in this case.

As is common in an oil and gas case, one group of claimants consisted of investors who asserted interests in various oil and gas properties operated by the estate.[2] These investors formed a committee which obtained counsel. In late 1988 or early 1989, this committee began to aggressively attack the trustee's *modus operandi* and that of his attorney, Michael Lam. Eventually, the committee proposed a liquidating plan ultimately confirmed by this court in August 1989. Stanley Wright was appointed liquidating agent under that plan. Moffitt was not released, however, pending his submission of a final report and accounting and a final application for compensation.

Moffitt seeks compensation of approximately $134,000 for his services as a chapter 11 trustee. Moffitt had also (with Judge Ayers' permission) employed himself as an accountant and in fact paid himself some $118,000 for these services. He intends by this application to credit the accounting compensation against the trustee fee so that the estate would only owe the difference between the two. The liquidating agent vehemently opposes this compensation, charging that Moffitt was guilty of misfeasance or malfeasance during his tenure. In addition, he alleges that Moffitt's fee is neither reasonable nor necessary, and that the estate should not be penalized for Moffitt's operating profligacy.[3]

Moffitt also seeks approval of his final report and accounting and a release from his bond. The liquidating agent opposes the latter relief.

### FINDINGS OF FACT

#### A. *The Suburban and the computer*

The estate owned a Chevrolet Suburban and a computer. Both were left uninsured.

Both were lost while under the care of Mr. Moffitt. Moffitt did not have a credible (or acceptable) explanation for the loss or disappearance of either of these items, or for why they were left uninsured.

The Suburban especially presents difficult problems. Moffitt allowed an NAOG employee to drive it as her own. She said she wanted to buy it but the vehicle was then reported stolen. The vehicle has not been recovered, nor was the vehicle promptly reported as stolen to the police. There is a deep suspicion (shared by the court) that the vehicle was in fact *not* stolen by anyone other than the very woman who was driving it.

#### B. *The horses and the bulldozer*

Moffitt sold a number of items of estate personalty, including a bulldozer and some horses, ostensibly with the "permission" of his bankruptcy counsel, Mr. Lam, without prior court approval. The sales were not noticed to creditors, nor was application made to sell them. None of the sales were made in the ordinary course of business. Moffitt's sole explanation for the manner in which the sales were consummated is that he cleared it with his bankruptcy lawyer, Mr. Lam, who assured him either that court approval was not required or that such sales, if they achieved a fair market price, were *de minimis* infractions which would be overlooked by the court. Mr. Lam's advice was not well-advised.

The horses are one of the better examples. There were three horses, two of which were described by the trustee as "plugs" and the third which was acknowledged to be a thoroughbred. Moffitt allows that the papers on the thoroughbred were "clouded" so that the horse's value was in doubt. All three were sold for

---

**2.** Indeed, one central feature of the case has been the dispute occasioned by a lack of recorded assignments of working interests in various wells promoted to these investors by NAOG's principal prior to bankruptcy, one Jerry L. Pettiet. Mr. Pettiet is currently a guest of the Texas Correctional Facility in Huntsville, Texas.

**3.** The court, prior to the hearing, was asked to advise the parties on its legal conclusions on

how to compute the base upon which the three percent trustee commission is figured. That legal analysis is set out below, but concludes *inter alia* that payments made on legitimate administrative costs incurred in operating the estate are part of that base. Thus, the higher these administrative costs, the higher the trustee's fee can conceivably be.

slightly over $2,600, without notice to creditors or approval by the court.

## C. *Professional fees*

Moffitt hired Michael Lam as his attorney. He also hired himself as his own accountant. Moffitt paid Lam over $90,000 in fees without prior court approval.[4] Moffitt also paid himself over $118,000 in accounting fees without prior court approval, as though he were a salaried employee of NAOG, rather than a professional retained by Moffitt as trustee. As a result, the fee included employment taxes paid on behalf of Moffitt by the estate. On top of this, Moffitt paid some $1,500 to one Pat Holloway (a bulldozer operator for NAOG prior to the bankruptcy) ostensibly for bookkeeping services associated with preparing the company's pre-bankruptcy 1987 tax return.[5] Moffitt also paid a "salary" to NAOG's former president, Bill Crabbe, in exchange for his cooperation with the estate. One Mark Plake, a former accountant with NAOG, was paid over $10,000 for accounting services related to the preparation of the 1987 tax return for oil and gas partnerships for which NAOG was managing partner. Spicer & Oppenheim was paid over $110,000 for re-doing some of this accounting work. Other oil and gas consultants, petroleum engineers and attorneys recovered additional sums from the estate, all without prior court approval. Moffitt simply cut them checks out of the operating account. The final report reflects legal and professional expenses totalling $310,697, but that number still does not include the $96,000 in "accounting payments to trustee" (plus employee withholding tax), or the additional professional fees incorporated in "pre-trustee, post-petition accrued expense" totalling $63,000.

Many of these professional fees have been revisited by this court. Some have been ratified, others compromised, and yet others are the subject of disgorgement orders. The sheer amount, relative to results achieved, is unconscionable.

## D. *Lease operations*

Moffitt, through his company, Moffitt & Partners, operated NAOG's wells.[6] It took over these operations from PSN Petroleum, an entity which had been operating these wells for approximately $200 per well, plus lease operating expenses, prior to the bankruptcy. Though Moffitt insists that he had to take over operations, lest PSN take advantage of the estate, no showing was made that such advantage was in fact taken. To the contrary, PSN voluntarily turned over well files and other information to Moffitt. It also turned over nearly $900,000 in escrowed runs, without offsetting its claims against NAOG, filing a proof of claim instead.[7]

Moffitt also spent over $200,000 in employee expenses, ostensibly to reconstruct well files and clear up entitlements to well proceeds. However, PSN had already delivered well files to Moffitt which Moffitt simply never inspected. PSN had also delivered a computer to Moffitt, which contained a substantial portion of the information regarding entitlements.[8] Moffitt

---

4. Moffitt insists Lam told him this was permitted under the language of the order of Judge Ayers appointing Lam. Lam has also testified this was his interpretation of the order. However, former Judge Ayers never permitted professionals to draw fees without first submitting a fee application.

5. This makes no more sense to the court than it does to the reader.

6. This opinion does not attempt to parse out true ownership, and instead simply refers to the wells owned or operated in whole or in part by NAOG as "NAOG's wells." The ownership issue was resolved by the confirmed plan of reorganization.

7. Moffitt argues he had to fight with PSN to get these proceeds but PSN's sole resistance was that it wanted the protection of a court order before turning over the funds, to avoid multiple liability to the estate and to working interest owners. The protections PSN sought are the sort on which similarly situated entities typically insist in cases such as this, usually by way of an interpleader action. *See Nationwide Mutual Fire Insurance Co. v. Eason,* 736 F.2d 130, 131 (4th Cir.1984).

8. PSN had been developing this information prior to the bankruptcy, with the assistance of Bill Crabbe, out of frustration that NAOG was not doing it and was not likely to do it.

failed to reconstruct NAOG's prebankruptcy financial statement, nor did he ever develop any accounting for pursuing preferential transfers, claims objections, and the like. Moffitt did, however, use some of his staff (ostensibly "on their own time") to run another business venture of his, a private mail delivery service called Pecan Postal.

On top of all this, the estate was also charged $139,805 in "oil well operations" for fifteen months of operating twelve wells. In addition, the estate paid out over $300,715 in "lease operating expenses." The court was unable to determine the difference between these two categories. Both of these charges are on top of the above employee expenses. They also exclude $58,000 worth of office supplies, $34,000 in rent, telephone, travel, $54,000 in postage and miscellaneous charges.

### E. *Distributions to investors*

Moffitt has, on the one hand, made much of the poor condition of the records, of the serious doubts about the title and entitlement to working interests in the wells, and of the overpayments and underpayments made by various drill funds, to justify the extraordinary expense of Moffitt's operating this estate in compliance with the bankruptcy process. On the other hand, by May 1988 (just two months after his appointment), Moffitt was making distributions to investors both of funds received from PSN and from current operations, and now proudly takes credit for getting these funds into the hands of investors without their suffering the delays of the bankruptcy process. He cannot logically maintain both positions.

What appears to be the truth of the matter is that Moffitt ran NAOG essentially as his own company, more as chief operating officer than as trustee. Perhaps because he had no investment of his own in the operation, he failed to put any controls on costs, which quickly got out of hand. Investors did not complain for some time,

because they were at least receiving their runs. Trade creditors, long accustomed to the minimal return they can usually expect out of an oil and gas bankruptcy, were simply moribund. Not until late 1989, when Moffitt began to reach into investors' pockets to run NAOG, did the investors' committee begin to raise their voices in protest. By then, Moffitt had spent over $400,000 in investor money running NAOG. Moffitt had also by this time disbursed over $1.8 million to those same investors during the bankruptcy, but they now feared that operating expenses of the bankruptcy threatened to derail the gravy train in short order unless they acted quickly. Over $4.4 million in production revenues had accrued to the estate, but nearly a million dollars of that amount had gone to operate NAOG.

There is simply no justification for any of this. Moffitt never obtained a court determination that the interests he was paying were proper, though that is a customary and accepted practice in oil and gas bankruptcy cases. He incurred operating expenses for operating wells far in excess of the going rate for such operations, and spent thousands of man-hours reconstructing well files and working interest entitlements that were already reconstructed. He did virtually none of the things a trustee is charged with doing (preserving assets, objecting to claims, recovering preferences), and had his attorney pursuing a piece of litigation against PSN for which he, in all likelihood, lacked standing to pursue.[9] All indications are that the great bulk of these expenses were neither reasonable nor necessary and served no one's interest beyond Moffitt and his staff.

### CONCLUSIONS OF LAW

1. The determination and award of compensation of professionals and court officers in a bankruptcy case is a core proceeding in which the bankruptcy court may enter a final, appealable order. 28 U.S.C. § 157(b).

---

**9.** The litigation was subsequently settled. Moffitt had proposed a settlement but the investors' committee intervened, eventually achieving a settlement more favorable to the estate, within a matter of weeks.

2. The maximum compensation of a chapter 11 trustee is limited to 15% of the first $1,000, 6% of the next $2,000, and 3% of any further amounts, computed on a "base" of monies disbursed or turned over in the case by the trustee to parties in interest. 11 U.S.C. § 326(a).

■ 3. In addition, the compensation of a chapter 11 trustee is further limited to reasonable compensation for actual, necessary services rendered by the trustee, based on the nature, extent, and value of such services, the time spent on those services, and the cost of comparable services other than in a bankruptcy case, plus reimbursement for actual, necessary expenses. 11 U.S.C. § 330(a).

4. The following terms used in Section 326(a) are not defined by the Bankruptcy Code: "disbursed;" "turned over;" "moneys [sic];" "parties-in-interest."

5. Section 726 directs the trustee to "distribute" property of the estate in accordance with the priority scheme set out therein. 11 U.S.C. § 726(a). Section 704(1) in turn imposes upon the trustee the duty to, *inter alia*, "collect and reduce to money the property of the estate. . . ." 11 U.S.C. § 704(1). One of the distributions of property the trustee is required to make is one "in payment of claims of the kind specified in ... section 507. . . ." 11 U.S.C. § 726(a)(1). Section 507 in turn sets out the priorities in which payments are to be made, starting with administrative expenses allowed under section 503(b). 11 U.S.C. § 507(a)(1). Section 503(b)(1) authorizes the allowance, as an administrative expense, of post-petition claims arising from the actual, necessary costs and expenses of preserving the estate, including wages, salaries, and commissions for services rendered to the estate post-petition. 11 U.S.C. § 503(b)(1)(A).

■ 6. Based upon the foregoing statutory provisions, the court concludes that disbursements to professionals and disbursements in payment of administrative expenses under Section 503(b)(1)(A) are includable in the base "all moneys disbursed or turned over to parties in interest" for purposes of calculating the maximum trustee's compensation allowed under Section 326(a). *In re Wallace*, 14 F.2d 534, 537 (E.D.Okla.1926), *aff'd sub nom.*, *Mcmillan v. United States Fidelity & Guar. Co.*, 22 F.2d 155 (8th Cir.1927) (construing Section 48(c) of the Bankruptcy Act of 1898); 11 U.S.C. § 326(a); 2 COLLIER ON BANKRUPTCY ¶ 326.01 at 326–16 (15th ed. 1990).

■ 7. The base is not limited to distributions of property of the estate, as a trustee may disburse monies to parties in interest, within the meaning of Section 326(a) without in the process having actually distributed property of the estate. *In re Castleberry*, 143 F. 1021 (N.D.Ga.1906). 2 COLLIER ON BANKRUPTCY ¶ 326.01 at 326–17 (15th ed. 1990). However, the base will exclude property (or monies attributable to such property) returned to a third party after a determination (whether by agreement of the parties or by court order) (a) that the property in question came into the hands of the estate by means of fraud or illegality or (b) that the property is not property of the estate and should be returned to its rightful owner(s).[10] *Gillespie v. J.C. Piles & Co.*, 178 F. 886 (8th Cir. 1910). 2 COLLIER ON BANKRUPTCY ¶ 326.01 at 326–18 (15th ed. 1990).

■ 8. Monies distributed by the chapter 11 trustee in this case to investors are includable in the base as "moneys disbursed to parties in interest" within the meaning of § 326(a), regardless whether the wells from which these funds came were in fact operated by a third party (including PSN). 2 COLLIER ON BANKRUPTCY ¶ 721.06 at 721–14 (15th ed. 1990).

■ 9. Monies distributed to third party operators may be included in the base under § 326(a), as these disbursements are distributions within the meaning of §§ 726(a)(1) and 503(b)(1)(A). *Wallace, supra*. However, monies *retained* by the estate as charges for operating well properties count as "income" to the estate, not as "monies disbursed to parties in interest" and are *not* includable in the base. *In re*

---

**10.** Monies disbursed *prior* to such a determination may be included in the base.

*Morris Bros.,* 8 F.2d 629 (C.D.Ore.1925); *In re Bofill,* 25 B.R. 550, 552 (Bankr. S.D.N.Y.1982).

■ 10. A trustee may incur administrative expenses for which he or she may be ⸳ entitled to compensation under § 503(b)(1)(A), in addition to the compensation permitted by § 330(a). *In re Orthopaedic Technology, Inc.,* 97 B.R. 596, 602 (Bankr.D.Colo.1989). However, compensation under § 330(a) may be reduced or eliminated entirely to the extent that the "administrative expense" duplicates the services of the trustee. *In re Prairie Cent. Ry. Co.,* 87 B.R. 952, 959 (Bankr.N.D.Ohio 1988); *In re Pickering,* 66 B.R. 11, 12 (Bankr.N.D.Ohio 1986). In addition, compensation for the administrative expense may, in a given case, be disallowed to the extent the holder of the claim is not "disinterested." 11 U.S.C. § 327(a). *In re Michigan General Corp.,* 77 B.R. 97, 106 (Bankr.N.D.Tex.1987).

■ 11. Monies disbursed to third parties as an expense of administration under § 503(b)(1)(A) may be recovered to the extent that there was a conflict of interest rendering the third parties not "disinterested" within the meaning of § 327(a) and therefore requiring disallowance of the administrative claim. *In re Neidig Corp.,* 113 B.R. 696, 699 (D.Colo.1990). To the extent disgorgement may be appropriate, and to the extent that the third party recipient was an insider of the trustee, the court may disallow, by way of offset, a portion of the trustee's compensation in an amount equal to the amount of the proposed disgorgement. *In re Hendersonville Bowling Center, Inc.,* 65 B.R. 963, 967 (Bankr. M.D.Tenn.1986).

■ 12. The liquidating agent is a party in interest, within the meaning of § 326(a). The term "party in interest" is found in 46 different sections of the Bankruptcy Code, yet is undefined in Section 101.

> Th[e] lack [of definition] ... was intentional. Congress' failure to define party in interest specifically was discussed by both Senator DeConcini and Representative Edwards during the proceedings pre-

ceding the enactment of the ... Code.... Senator DeConcini stated: "Rules of bankruptcy procedure *or court decisions* will determine who is a party in interest for the particular purposes of the provision in question." 124 Cong. Rec. § 12407 (daily ed. Oct. 6, 1978).... Party in interest is an *expandable concept* depending on the particular factual context in which it is applied....

*In re River Bend–Oxford Assoc.,* 114 B.R. 111, 113 (Bankr.D.Md.1990) (emphasis added). The court has been unable to find a reported decision construing the phrase as it is used in Section 326(a). In other contexts, the phrase has been held to refer to anyone who has a practical stake in the outcome of a case (*In re Amatex Corp.,* 755 F.2d 1034, 1041–44 (3rd Cir.1985)), to those who, because of the impact of the reorganization, deserve fair representation in the case (*In re Johns–Manville Corp.,* 36 B.R. 743, 754 (Bankr.S.D.N.Y.1984) *aff'd* 52 B.R. 940 (S.D.N.Y.1985)), or to one who has an actual pecuniary interest in the case (*Kapp v. Naturelle, Inc.,* 611 F.2d 703, 706 (8th Cir.1979); *In re A–1 Trash Pick-up, Inc.,* 57 B.R. 380 (E.D.Va.1986)). Courts have emphasized the flexibility with which the concept should be applied, consistent with the goals of the bankruptcy process. *In re Summit Corp.,* 891 F.2d 1, 5 (1st Cir.1989); *In re River Bend–Oxford Assoc.,* 20 B.C.D. 875 (Bankr.D.Md.1990). The court in *Summit* also correctly distinguished the phrase from the narrower *"real* party in interest" concept used in Rule 19 of the Federal Rules of Civil Procedure. *Id.; but see In re Tour Train Partnership,* 15 B.R. 401, 402 (Bankr.D.Vt. 1981) (derivative claimants not parties in interest); *Matter of Goldman,* 82 B.R. 894, 895 (Bankr.S.D.Ohio 1988) (creditors of an estate's creditor are not parties in interest).

The underlying purpose of Section 326(a) is to assure that the trustee's compensation is fairly proportional to job results. In the last analysis, the ultimate function of a trustee is to distribute the assets of the estate. *See* 11 U.S.C. §§ 725, 726; *In re Comcoach Corp.,* 698 F.2d ⸳571, 573 (2d Cir.1983); *Goldman,* 82 B.R. at 895. If

that distribution is made to a liquidating agent under a plan of reorganization, the trustee has accomplished his or her task no less than if the distribution had been made directly to the creditors. If Congress had intended that a trustee's percentage fee be computed only on the distributions made directly to creditors, Congress could simply have used that more precise term. Instead, Congress gave courts the flexibility to adapt trustees' compensation to the variety of payout scenarios which actual cases might generate. In that way, trustees would not be unfairly victimized by clever plan drafting designed to take advantage of a technicality in the statute.[11]

"Party in interest," in the context of Section 326(a), should therefore be construed to include an entity to whom distribution of estate assets is legitimately made in furtherance of the overall distribution process contemplated in bankruptcy, in this case, the liquidating agent under a confirmed plan of reorganization.[12] Such an interpretation furthers the underlying goal of Section 326(a) to fairly compensate the trustee for doing his or her job. The liquidating agent here is therefore a party in interest within the meaning of Section 326(a).

13. The liquidating agent designated by the chapter 11 plan is a "contractual trustee" created by agreement of the creditors of the estate, not a "statutory trustee" appointed under the provisions of the Bankruptcy Code. *In re Schultz,* 69 B.R. 629,

631 (D.S.D.1987). The compensation of the liquidating agent is controlled by the terms of the chapter 11 plan, notwithstanding that the *measure* of compensation might be identical with that set out in the Bankruptcy Code. *Schultz,* 69 B.R. at 631. Distributions to the liquidating agent do not, therefore, constitute the mere passage of title to a successor trustee but are rather "disbursements" to a party in interest within the definition of Section 326(a) of the Bankruptcy Code. *See In re New England Fish Co.* 34 B.R. 899, 902 (Bankr. W.D.Wash.1983).

■ 14. Unliquidated assets simply "turned over" to the liquidating agent are not includable in the base,[13] because only "moneys" turned over qualify for inclusion in the base. *Bofill,* 25 B.R. at 552. No fee is due the chapter 11 trustee for the "value" of those assets turned over to anyone, including the liquidating agent.[14] *Monies* turned over to the liquidating agent, on the other hand, do qualify for inclusion in the base, as they fall within the statutory rubric.[15]

■ 15. A showing of entitlement to compensation for services rendered is ineffective as a matter of law to authorize compensation in excess of the "cap" set out in Section 326(a). *In re Rauch,* 110 B.R. 467, 472 (Bankr.E.D.Cal.1990). Regardless of the seeming inequity of this cap when applied to the exigencies of a given case, a

---

11. Of course, that was neither the design nor the intention of *this* plan. The court merely anticipates how creative lawyers might take advantage of overly technical or narrow statutory terms.

12. One helpful test for determining whether such an entity is a party in interest might be whether, incident to that distribution, the chapter 11 trustee will be expected to prepare a final report and accounting. Consistent with the flexibility with which the term must be employed, however (especially in this context), the court is unwilling to fashion any kind of "bright-line test."

13. This includes specifically the turnover of the Zimmerman–Chamberlain well to the liquidating agent under the plan.

14. The court commends to the reader the facts of the *San Juan Hotel* bankruptcy case as the

best rationale for this rule. *See In re San Juan Hotel Corp.,* 71 B.R. 413 (D.P.R.1987).

15. In the rare case, distributions of property other than cash might be includable in the base, where the distribution constitutes a liquidation of the estate and, for reasons having to do with the unique factual posture of the case, actual conversion to cash is not appropriate. For example, a trustee might in certain circumstances be called upon to distribute equity instruments, notes, or even assignments, in satisfaction of outstanding claims against the estate. To the extent that these distributions can *easily* and *readily* be quantified in money or money's worth, the transactions could justifiably be included in the base. *See In re Greenley Energy Holdings of Pennsylvania, Inc.,* 102 B.R. 400, 405 (E.D.Penn.1989).

court is not permitted to amend the clear language of the statute. *Rauch,* 110 B.R. at 472; 11 U.S.C. § 326(a).

 16. The trustee may not recover on distributions not yet made (such as funds not yet turned over to the liquidating agent). *New England Fish,* 34 B.R. at 902.

17. Section 326(a) is a cap on compensation, not a floor. The trustee may only be paid "reasonable compensation for actual, necessary services...." 11 U.S.C. § 330(a). The two-step process contemplated by the structure of the statute prevents a court from limiting the base on grounds that the distributions made were not reasonable or were for expenses which duplicated the services of the trustee. Instead, the court *first* computes the base from the disbursements made, including those made for administrative expenses. In the process, the court may determine to disallow certain expenses and, in cases involving insider entities, to order disgorgement. The court *then* determines the extent to which the trustee should be compensated, based on whether the trustee's services for which he or she seeks compensation were (1) actual, (2) necessary, and (3) rendered by the trustee, and further based on whether the fee requested is reasonable compensation for those services, based on their nature and value and as compared with comparable services in a non-bankruptcy context. That is the approach employed in this case.

### APPLYING THE LAW TO THE FACTS

 1. The base in this case includes distributions made to investors by Moffitt prior to confirmation of the plan. These total $1,871,265. The base also includes payments made to professionals which have been allowed by this court, in the amount of $621,550. In addition, operating expenses incurred to third parties (other than to Moffitt himself or to Moffitt & Partners), are includable in the base. These operating expenses total $216,167.

2. Operating expenses charged to the estate by Moffitt & Partners ("M & P") are not includable in the base, because of the insider relationship between M & P and Robert Moffitt.

3. Accounting fees paid to Robert Moffitt are not includable in the base for the same reason.

 4. The accounting fees which Moffitt paid himself are not properly compensable. Those fees duplicate Moffitt's duties as trustee in this case, as well as the services rendered by bookkeepers and other accountants (including Spicer & Oppenheim) already paid by the estate. These fees are accordingly to be disgorged.

 5. The conduct of the trustee in this case, as reflected in the court's findings, significantly undercuts the trustee's right to receive compensation for any of the "services" rendered to the estate. Whatever compensation to which he might otherwise have been entitled seems to have been overwhelmingly offset by the extraordinary expenses his administration of the case imposed on the estate. In the view of this court, it has already cost this estate enough to maintain the estate's assets and administer the bankruptcy. The overlay of yet another administrative expense, especially one with the priority of a trustee's fee, seems entirely unjustified. The trustee's request for compensation is accordingly disallowed in its entirety.

6. To the extent that the trustee has already received compensation (whether as trustee or as accountant), he must disgorge those funds to the estate.

7. Because of the foregoing findings, the court is unable to approve the Trustee's Final Report and Accounting. The Trustee is therefore not discharged from his duties to account for assets of the estate, nor is he released from liability to the estate or its successors-in-interest.[16]

So ORDERED.

---

16. This ruling is not intended to prevent the

liquidating agent from discharging his *contrac-*

*tual* duties under the plan to distribute assets in accordance with the plan's terms.