**In re CITI–TOLEDO PARTNERS II, Debtor.**

No. 93–33473.

United States Bankruptcy Court,
N.D. Ohio,
Western Division.

April 11, 2000.

Elizabeth A. Vaughan, Toledo, OH, Interim Trustee.

Derrick V. Rippy, Cleveland, OH, for U.S. Trustee.

Mary Ann Whipple,Toledo, OH, for Interim Trustee.

### MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Chief Judge.

This cause comes before the Court upon the Trustee's Computation of Requested Fees and the United States Trustee's objection thereto. On January 11, 2000, the Court held a hearing on the matter at which time the issues involved in this dispute were presented to the Court. Thereafter, upon taking the matter under advisement, the Parties each submitted briefs in support of their respective positions. This Court has now had the opportunity to review the arguments presented by the Parties, the exhibits, as well as the entire record of the case. Based upon that review, and for the following reasons, the Court finds that the United States Trustee's objection should be Denied subject to the conditions contained in this Opinion.

### FACTS

In the early 1990's two related, but distinct partnerships known as "Citi–Toledo Partners I" and "Citi–Toledo Partners II"

were formed to construct, and thereafter operate multi-family low income housing units in Maumee, Ohio. As a part of this business endeavor, Citi–Toledo Partners I executed, on February 24, 1993, a General Warranty Deed to Citi–Toledo Partners II consisting of slightly less than one-half (½) of a plat of land upon which the low income housing units were to be constructed. Citi–Toledo Partners I then kept the other half of this property for similar development. It was later discovered, however, that the Deed executed between the two partnerships attempted a lot split which could not be accomplished without replatting. As a result, the Deed effectuating the land transfer between the partnerships was not, in fact, recorded until January 24, 1994, almost a full year after the Deed was executed. However, before the Deed was actually recorded, various creditors of the two partnerships had commenced separate involuntary Chapter 7 petitions against them, which after the occurrence of some interim events, eventually culminated in both partnerships being put into a Chapter 7 bankruptcy pursuant to an order entered on June 23, 1994, by the Honorable Walter J. Krasniewski. *See In re Citi–Toledo Partners*, 170 B.R. 602, 606 (Bankr. N.D.Ohio 1994).

Thereafter, in accordance with 11 U.S.C. § 701, two different trustees were appointed to manage each of the partnership's individual Chapter 7 cases; namely John Graham (hereinafter referred to as Mr. Graham) was appointed as the trustee for the bankruptcy estate of Citi–Toledo Partners I, while Elizabeth Vaughan (hereinafter referred to as Ms. Vaughan) was appointed as the trustee for the bankruptcy estate of Citi–Toledo Partners II. At the time Ms. Vaughan was appointed as the bankruptcy trustee for the estate of Citi–Toledo's Partners II, the major, if not only asset held by that partnership was the

real property deeded to it by Citi–Toledo Partners I. Notwithstanding, Mr. Graham informed Ms. Vaughan that, given the circumstances under which the Deed accomplished the transfer of property between the two partnerships, he would be bringing an adversary action to avoid that transfer of property. However, as the optimal value of the two separate properties could only be realized by selling the properties as a whole, both trustees agreed that litigation over this matter would be delayed until after the sale of the properties was finalized. In accordance therewith, the separate properties of the partnerships were jointly sold to the same purchaser for a sale price of Three Million Six Hundred Thousand dollars ($3,600,-000.00), of which amount the estate of Citi–Toledo Partners II received approximately One Million Nine Hundred Thousand dollars ($1,900,000.00).[1]

Subsequent to the sale of the property, Mr. Graham brought an adversary action against the bankruptcy estate of Citi–Toledo Partners II to set aside the transfer of the property it had received from Citi–Toledo Partners I. Before the case proceeded to trial, however, Mr. Graham and Ms. Vaughan settled the matter, with the terms of their settlement agreement providing that the estate of Citi–Toledo Partners II would turn over to the bankruptcy estate of Citi–Toledo Partners I all the funds it had received from the sale of the property originally deeded to it by Citi–Toledo Partners I, excepting Three Hundred Sixty Thousand dollars ($360,000.00). After completing this transaction, the facts of this case show that Ms. Vaughan evaluated and, where appropriate, objected to those claims filed by creditors, and thereafter would up the bankruptcy estate of Citi–Toledo Partners II. For these services, Ms Vaughan filed a request for Fifty-seven Thousand Two Hundred Nine and

---

1. The One Million Nine Hundred Thousand Dollar ($1,900,000.00) figure received by Citi–Toledo Partners II, however, was later reduced by One Hundred Fifty-three Thousand Eight Hundred Ninety-nine and 57/100 dollars ($153,899.57), the amount of which was paid to the estate of Citi–Toledo Partners II, in recognition of the proper division of proceeds on account of the actual relative value of the two separate parcels of property.

58/100 dollars ($57,209.58) in fees pursuant to §§ 326(a) and 330(a) of the Bankruptcy Code. Included as a part of Ms. Vaughan's base for computing her fees under § 326(a), against which the United States Trustee objects, were those funds transferred to the bankruptcy estate of Citi–Toledo Partners I as a part of the settlement agreement reached between her and Mr. Graham. In support of her request for trustee fees, Ms. Vaughan attached the extensive docket list which the case of Citi–Toledo Partners II had generated.

## LAW

### 11 U.S.C. § 326. Limitation on compensation of trustee

Section 326(a) of the Bankruptcy Code provides:

> In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

## DISCUSSION

The principal issue before this Court is whether a bankruptcy trustee is entitled to compensation, under 11 U.S.C. § 326(a), for the moneys he or she turns over to another bankruptcy trustee as a result of the latter trustee's avoiding powers. As such a determination clearly concerns the

2. Originally, Elizabeth Vaughan had sought Seventy-two Thousand Six Hundred Twenty-six and 56/100 dollars ($72,626.56) in compensation for her work as bankruptcy trustee.

administration of the debtor's bankruptcy estate, this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

 The principal function of the bankruptcy trustee is to collect and then distribute the assets of the bankruptcy estate. For these services the trustee is entitled to compensation, and to ensure that the trustee's compensation is fairly proportional to the results obtained, § 326(a) of the Bankruptcy Code sets limits on the amount of compensation that may be awarded to a trustee for their work in administering a Chapter 7 or 11 bankruptcy case. *See In re North Am. Oil & Gas, Inc.,* 130 B.R. 473, 479 (Bankr. W.D.Tex.1990).

 The limitations contained in § 326(a) on a trustee's fees are, in decreasing percentile increments, based upon all moneys disbursed or turned over by the trustee to a "party in interest." In this regard, Ms. Vaughan seeks Fifty-seven Thousand Two Hundred Nine and 58/100 dollars ($57,209.58)[2] in compensation for the work she performed in connection with administering the bankruptcy estate of Citi–Toledo Partners II. The United States Trustee, however, objects to this figure, asserting that Ms. Vaughan's request should be lowered by Forty-two Thousand Three Hundred Nine and 60/100 dollars ($42,309.60), to a total of only Fourteen Thousand Eight Hundred Ninety-nine and 98/100 dollars ($14,899.98) in fees, on the grounds that specifically included in Ms. Vaughan's base, for computing her fees under § 326(a), were those funds she turned over to Mr. Graham as a part of the settlement agreement reached between the two Parties. In support of this objection, the United States Trustee raises essentially three different arguments, which the Court will now address in turn.

However, she subsequently modified this figure downward in light of certain monetary transactions that took place between her and Mr. Graham after the sale of the property.

The first argument asserted by the United States Trustee holds that the facts of this case conform with the two prohibitions against compensation contained in the case of *In re North American Oil & Gas, Inc.*, where the Bankruptcy Court for the Western District of Texas stated:

a trustee may disburse monies to parties in interest, within the meaning of Section 326(a) without in the process having actually distributed property of the estate. However, the base will exclude property (or monies attributable to such property) returned to a third party after a determination (whether by agreement of the parties or by court order) (a) that the property in question came into the hands of the estate by means of fraud or illegality or (b) that the property is not property of the estate and should be returned to its rightful owner(s).

130 B.R. 473, 478 (Bankr.W.D.Tex.1990) (internal citations omitted). Upon examining this argument, however, the Court, while generally agreeing with the above statement, disagrees, for the following two reasons, that the facts of this case conform to the above prohibitions.

■ First, no evidence has been presented that the Deed executed between Citi–Toledo Partners I and Citi–Toledo Partners II was itself tainted with fraud.[3] This is not to say that the transfer of property between the partnerships would not qualify as a fraudulent conveyance given that there does not appear to have been a contemporaneous exchange of value at the time the Deed was executed. However, the term fraudulent, for purposes of finding that a transaction was a fraudulent conveyance, does not necessarily mean that the underlying transaction stems from the actual fraud of one or both of the parties. For example, Ohio's law on fraudulent conveyances offers, under O.R.C. § 1336.04(A)(2),[4] an external test of constructive fraud in which actual fraud does not have to be shown. *Cresho v. Cresho*, 97 Ohio App.3d 5, 11, 646 N.E.2d 183 (1994).

■ The second reason the Court rejects the foregoing argument put forth by the United States Trustee is that even though the transfer of the property between the two partnerships was avoidable pursuant to Mr. Graham's avoiding powers as a bankruptcy trustee, it does not also denote that the property transferred between the partnerships did not become a part of the bankruptcy estate of Citi–Toledo Partners II. Stated in more succinct terms, merely because the property which Ms. Vaughan administered as bankruptcy trustee was subject to another trustee's avoiding powers, it does not thereby denote that such property was not a part of the bankruptcy estate administered by Ms. Vaughan. *See* § 541(a) (property of the estate includes all legal and equitable interest of the debtor in property). In fact, this Court notes that Ms. Vaughan would have almost certainly been in violation of the duties prescribed to her under the

3. This statement should not be taken to mean that the Court feels that the business dealings of the two partnerships were completely honest. In fact to the contrary, an examination of the business dealings of Citi–Toledo Partners I and Citi–Toledo Partners II exhibit a number of questionable transactions. However, this Court has nothing before it which would indicate that the actual transfer of property between the two partnerships involved actual fraud.

4. Section 1336.04(A) provides that, "[a] transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was in-

curred, if the debtor made the transfer or incurred the obligation in either of the following ways: (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies: (a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; (b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

Bankruptcy Code had she not sought to administer the property transferred to Citi–Toledo Partners II. *See* 11 U.S.C. § 323(a) (trustee is a representative of the estate); 11 U.S.C. § 704 (specifying a Chapter 7 trustee's duties). Accordingly, for these reasons, the Court must reject the first argument put forth by the United States Trustee in support of its objection against Ms. Vaughan's calculation of compensation under § 326(a).

The second overall argument raised by the United States Trustee against Ms. Vaughan's calculation of fees holds that as Mr. Graham is himself seeking compensation for the disbursement of the funds turned over to him by Ms. Vaughan, to also now allow Ms. Vaughan to receive compensation for the disbursement of these same funds would in essence be "double dipping," and thus would be inconsistent with the policy behind § 326. In support thereof, the United States Trustee offers two arguments. First, it is asserted that to allow Ms. Vaughan to receive compensation for the turnover of funds to John Graham would be in violation of paragraph (c) of § 326, which provides that:

> If more than one person serves as trustee in the case, the aggregate compensation of such persons for such service may not exceed the maximum compensation prescribed for a single trustee by subsection (a) or (b) of this section, as the case may be.

However, the Court must reject this argument as Mr. Graham and Ms. Vaughan each administered separate bankruptcy cases, and § 326(c) only applies when more than one trustee serves in the same bankruptcy case, a situation which typically arises when an interim trustee is later displaced by an elected trustee. *See In re*

*Arius, Inc.*, 237 B.R. 843, 846 (Bankr. M.D.Fla.1999).

The second issue raised by the United States Trustee in this regards holds that as 11 U.S.C. § 363(j) [5] specifically prohibits a trustee from receiving compensation for the disbursement of funds turned over to a non-debtor entity which had a co-ownership interest in an item of property, so too should compensation be denied to Ms. Vaughan given that this case is very analogous to such a situation. However, the Court must also reject this argument as the real estate sold in this case was composed of two separate parcels of property held by two separate bankruptcy estates, and § 363 specifically limits its coverage to the situation where one parcel of property is held by two or more co-owners.

The last overall argument raised by the United States Trustee against Ms. Vaughan's computation of her trustee's fees holds that the funds turned over to Mr. Graham cannot be included in Ms. Vaughan's computation of fees given the fact that Mr. Graham does not constitute a "party in interest" for purposes of § 326(a). In addressing this argument, the Court begins with an examination of the term itself. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) (in a case involving the interpretation of a statute, any analysis must necessarily begin with the language of the statute itself).

The phrase "party in interest," although utilized in forty-six (46) different sections of the Bankruptcy Code and well over thirty (30) Bankruptcy Rules, is not actually defined therein. Such an omission, however, was not accidental. Instead, Congress, given the variety of situations in which the term "party in interest" is used, thought it best to leave the actual

---

5. This section provides that, "[a]fter a sale of property to which subsection (g) or (h) of this section applies, the trustee shall distribute to the debtor's spouse or the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of such spouse or co-owners, and of the estate."

defining of the term up to the bankruptcy courts charged with enforcing the provisions of the Bankruptcy Code. *In re River Bend–Oxford Assoc.*, 114 B.R. 111, 113 (Bankr.D.Md.1990). In defining the term, however, the legislative history preceding the enactment of the Bankruptcy Code indicates that a court should give the term a broad interpretation after giving due consideration to the particular context in which the term will be applied. *In re Delta Underground Storage Co.*, 165 B.R. 596, 598 (Bankr.S.D.Miss.1994) (internal quotations omitted.) *citing* 124 Cong.Rec. § 12407 (daily ed. Oct. 6, 1978); *Peachtree Lane Assoc., Ltd. v. Granader (In re Peachtree Lane Assoc., Ltd.)*, 188 B.R. 815, 824 (N.D.Ill.1995). For example, outside the context of § 326(a), a "party in interest" has been held to encompass any party who has an actual pecuniary interest in the case, as well as to those parties who have a practical stake in the outcome of the case, or to those parties who will be impacted in any significant way by a decision made in the case. *In re Cowan*, 235 B.R. 912, 915 (Bankr.W.D.Mo.1999) *citing Kapp v. Naturelle, Inc.*, 611 F.2d 703, 706 (8th Cir. 1979); *In re Amatex Corp.*, 755 F.2d 1034, 1041–44 (3rd Cir.1985); *In re Johns–Manville Corp.*, 36 B.R. 743, 754 (Bankr. S.D.N.Y.1984).

▪ In the case of *In re North American Oil & Gas, Inc.*, the bankruptcy court for the Western Division of Texas had cause to visit the issue of who would constitute a "party in interest" for purposes of § 326(a) and stated:

Party in interest, in the context of Section 326(a), should ... include an entity to whom distribution of estate assets is legitimately made in furtherance of the overall distribution process contemplated in bankruptcy[.]

130 B.R. 473, 479 (Bankr.W.D.Tex.1990). Upon examining this definition, the Court agrees that such an interpretation gives due deference to the underlying purpose of § 326(a) (i.e., to assure that the trustee's compensation is fairly proportional to job results), while at the same time conforming to the axiom that the term "party in interest" should be interpreted broadly. Accordingly, the Court will apply this definition to the instant case, and thus it is now necessary to determine if Mr. Graham, by receiving the funds turned over to him as a result of the Parties' settlement agreement, would constitute an entity to whom Ms. Vaughan would have made a remuneration in furtherance of the overall distribution process contemplated in bankruptcy.

▪ One of the basic goals of bankruptcy law is to effectuate an equitable distribution of estate asserts to the debtor's creditors. *Commercial Credit, Etc. v. Northbrook Lumber Co., Inc.*, 22 B.R. 992, 996 (N.D.Ill.1982). Section 726(a) facilitates this goal by prescribing a hierarchal list of parties to whom a distribution is to be made upon the liquidation of the debtor's nonexempt assets. This list, however, is limited to parties who hold either a claim against the debtor's bankruptcy estate, or to those parties entitled to an administrative expense under § 503. 11 U.S.C. § 726(a). Thus, for Mr. Graham to be considered a "party in interest," for purposes of § 326, Citi–Toledo Partners I must have held, as a result of the land transfer made between the two partnerships, a potential claim against the estate of Citi–Toledo Partners II, or in the alternative, Ms. Vaughan's remuneration to Mr. Graham must qualify as a postpetition administrative expense under § 503. The Court begins its analysis with the former.

▪ A claim for purposes of the Bankruptcy Code is defined under 11 U.S.C. § 101(5) as a "right to payment." [6] In the

**6.** Claim is fully defined by § 101(5) of the Bankruptcy Code as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or [a] right to an equitable remedy for breach of performance if such breach gives rise to a

present case, therefore a "right to payment" in favor of Mr. Graham can be said to have materialized on June 23, 1994, the date on which both partnerships were placed in a Chapter 7 bankruptcy, given the basic principle of bankruptcy jurisprudence that a trustee's avoiding powers arise on the date on which a bankruptcy petition is filed. *In re Miller*, 31 B.R. 75, 76 (Bankr.D.Neb.1983) (the cleavage date for determining when the trustee's avoiding powers arise is the date of the filing of the petition); *In re Bremer*, 104 B.R. 999 (Bankr.W.D.Mo.1989) (the date of filing of the debtor's bankruptcy determines when the trustee's avoiding powers arise).

▪▪▪▪ Notwithstanding, merely because an entity holds a "right to payment," and thus a claim for purposes of § 101(5), does not thereby denote that such an entity is entitled to a distribution under the Bankruptcy Code. Instead, for an entity to be entitled to a potential distribution in a bankruptcy case, such an entity must also hold an allowable claim pursuant to §§ 501 and 502 of the Bankruptcy Code. However, in a Chapter 7 bankruptcy, implicit within the concept of an allowable claim is the notion that, except for a few specified exceptions,[7] in order for a claim to be allowable, and thus entitled to a distribution, it must have arisen prepetition. 11 U.S.C. § 501; *see also Piper Aircraft Corp. v. Calabro (In re Piper Aircraft Corp.)*, 169 B.R. 766, 777 (Bankr. S.D.Fla.1994) (all claims either arise or are deemed as arising before filing date, since claims treated as arising postpetition would, by definition, be against debtor-in-possession and therefore an administrative expense and not a claim); *In re Mall At One Assoc., L.P.*, 185 B.R. 1009, 1014 (Bankr.E.D.Pa.1995) (claim generally ref-

erences prepetition obligations). In this case, however, Mr. Graham's "right to payment" against Citi–Toledo Partners II cannot be said to have come into existence prepetition, based upon the fact that both partnerships were placed into a Chapter 7 bankruptcy at essentially the same time.[8] As a consequence, the Court cannot find that Mr. Graham's "right to payment," against the partnership of Citi–Toledo Partners II, would constitute a claim that would be entitled to a distribution under the Bankruptcy Code. Accordingly, Ms. Vaughan's turn over of funds to Mr. Graham must constitute an administrative expense under § 503 in order to qualify as a distribution made in furtherance of the overall distribution process contemplated in bankruptcy.

▪▪▪▪ There presently exist eight (8) different categories of administrative expenses allowable in a bankruptcy case under § 503(a). However, an examination of these categories, by the Court, reveals that the only type of administrative expense potentially applicable in the instant case is the one contained in paragraph (b)(1)(A) of § 503, which provides, in relevant part: "[a]fter notice and a hearing, there shall be allowed, administrative expenses... [for] the actual, necessary costs and expenses of preserving the estate...." In this regard, the words "actual" and "necessary" mean that the cost or expense incurred must directly and substantially benefit the estate. *Accord In re Williams*, 165 B.R. 840, 841 (Bankr.M.D.Tenn.1993). In turn, the word "cost" simply means the "sum or equivalent expended." BLACK'S LAW DICTIONARY 345 (6th ed.1990).

▪▪▪▪ Pursuant to these standards, the Court finds that Ms. Vaughan's turnover

---

right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured[.]"

**7.** Section 501(d) provides that, "[a] claim of a kind specified in section 502(e)(2), 502(f), 502(g), 502(h) or 502(i) of this title may be filed under subsection (a), (b), or (c) of this

section the same as if such claim were a claim against the debtor and had arisen before the date of the filing of the petition."

**8.** *See In re Stoecker*, 118 B.R. 596, 601 (Bankr.N.D.Ill.1990) (bankruptcy trustee bears burden of proof in all matters concerning his fees).

of funds to Mr. Graham would constitute a necessary cost of preserving the estate under § 503. Specifically, the Court observes that had Ms. Vaughan not reached an agreement with Mr. Graham concerning the funds originally received by Citi–Toledo Partners II, Mr. Graham may have entirely prevailed in his adversary action against Ms. Vaughan, with the end result being that virtually no assets would have been available for Ms. Vaughan to distribute to the creditors of Citi–Toledo Partners II. In fact, the circumstances of this case show that Ms. Vaughan's entire reason for entering into a settlement agreement with Mr. Graham was to preserve at least some assets for the benefit of the creditors of Citi–Toledo Partners II. Thus, Ms. Vaughan, by agreeing to a settlement with Mr. Graham, was able to preserve estate assets, in the amount of Three Hundred Sixty Thousand dollars ($360,000.00), with the cost, or sum expended for such preservation constituting the funds she turned over to Mr. Graham.

Therefore, based upon this finding, the Court holds that, in accordance with the definition of a "party in interest" as set forth in the case of *In re North American Oil & Gas, Inc.*, Mr. Graham constituted an entity to whom a distribution of estate assets were legitimately made in furtherance of the overall distribution process contemplated in bankruptcy. Accordingly, § 326(a) does not present an absolute bar against Ms. Vaughan receiving compensation for the funds she turned over to Mr. Graham.

 Notwithstanding, the Court's analysis does not end there as § 326 does not, in itself, create an entitlement to the maximum amount of compensation provided for under that section. *In re Draina*, 191 B.R. 646, 648 (Bankr.D.Md.1995). Instead, it is § 330(a), and not § 326(a), which authorizes and fixes the standards for a trustee's compensation. *Connolly v.*

*Harris Trust Co. of California (In re MiniScribe Corp.)*, 241 B.R. 729, 734 (Bankr. D.Colo.1999). Consequently, a court must first reach a determination as to whether a trustee is entitled to compensation under § 330, before determining the applicability of the cap on compensation as set forth in § 326. H.R. Rep. No. 595, 95th Cong. 1st Sess. 327 (1977).[9]

 Section § 330(a), provides, in pertinent part, that:

> After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103—
>
> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and
>
> (B) reimbursement for actual, necessary expenses.

Thus, pursuant to this statutory scheme, a two step process must be undertaken to determine if a trustee is entitled to receive compensation for work in administering a bankruptcy case. First, § 330(a) requires that the work performed by the trustee must have been an "actual" and "necessary" service. In addition, § 330(a)(4)(A)(ii) further refines this requirement by prohibiting compensation for services that were not reasonably likely to benefit the estate, or that were not necessary to the administration of the estate. Thereafter, if this threshold requirement is met, the trustee is entitled to be compensated, but such compensation must still be limited to a "reasonable" amount. 11 U.S.C. § 330(a)(1)(A). In making a determination under § 330(a) as to what amount of compensation is reasonable, a court is required to "consider the nature, the ex-

---

9. Section 330(a)(2) permits a court on its own motion to raise the propriety of a trustee's fees.

tent, and the value of [the] services, taking into account all relevant factors, including," but not limited to:

(1) the time spent on such services;

(2) the rates charged for such services;

(3) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(4) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(5) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

██ Upon applying the § 330(a) test to the instant case, the Court, having only before it the docket list generated by the bankruptcy case of Citi–Toledo Partners II, is unable to make a determination as to whether the Forty-two Thousand Three Hundred Nine and 60/100 dollars ($42,-309.60) [10] in fees Ms. Vaughan seeks for her turn over of funds to Mr. Graham conforms with the standards set forth in § 330(a).[11] However, given the interests at stake in this case, the Court finds it appropriate that Ms. Vaughan be given the opportunity to establish her entitlement to such fees under the requirements expounded in § 330(a). In this regard, Ms. Vaughan will be expected to present an accounting of her fees to the Court, along with the reason(s) that she feels that the performance of such services conform with the standards articulated in § 330(a).

In summary, the Court holds that a bankruptcy trustee is not, as a matter of law, prohibited from receiving compensation under 11 U.S.C. § 326(a) for the moneys he or she turns over to another bankruptcy trustee as a result of the latter trustee's avoiding powers. Thus, Ms. Vaughan is not altogether prohibited from using in her calculation of fees under § 326(a), the funds she turned over to Mr. Graham. However, to be permitted such fees, Ms. Vaughan must demonstrate, under the standards set forth in 11 U.S.C. § 330(a), that she is entitled to receive such fees, a condition upon which this Court, on account of insufficient evidence, is unable to make a ruling at this time. In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that the Objection of the United States Trustee to Elizabeth Vaughan's Computation of Requested Fees be, and is hereby, DENIED.

It is **FURTHER ORDERED** that Elizabeth Vaughan, within Thirty (30) Days of the Entry of this Order, submit to the Court an accounting of the fees and expenses she incurred in administering the funds turned over to John Graham, and the reason(s) why such fees and expenses should be permitted under 11 U.S.C. § 330(a). The United States Trustee is thereafter given Fourteen (14) Days to interject any objections thereto.

---

**10.** This figure represents the amount by which the United States Trustee seeks to reduce Ms. Vaughan's fees.

**11.** Ms. Vaughan did present a docket sheet itemizing all the actions that were brought in this Court. However, from this evidence

alone, the Court cannot ascertain the extent to which such actions were attributable to the actual and necessary services Ms. Vaughan performed in relationship to the funds turned over to Mr. Graham.